[L. A. No. 19305. In Bank. Jan. 29, 1946.]

VEGA AIRCRAFT (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and WILLIAM E. NIELSEN, Respondents.

Syril S. Tipton for Petitioner.

E. A. Corten and R. C. McKellips for Respondents.

SCHAUER, J.—Petitioner, Vega Aircraft, a corporation, seeks annulment of an award of increased compensation made by respondent Industrial Accident Commission in favor of respondent William E. Nielsen. Section 4553 of the Labor Code provides that "The amount of compensation otherwise recoverable shall be increased one-half where the employee is injured by reason of the serious and wilful misconduct of any of the following: . . . (c) If the employer is a corporation, on the part of an executive, managing officer, or general superintendent thereof." The commission found that the "injury was proximately caused by the serious and wilful misconduct of the employer." Petitioner contends that there is not sufficient evidence that the conduct complained of was that of an executive, managing officer, or general superinten-

dent, or was serious and wilful misconduct, or was the proximate cause of injury. It further argues that the quoted finding is insufficient and amounts only to a conclusion of law. We have concluded that petitioner's contentions cannot be sustained.

At the time Nielsen was injured he was employed in the experimental department of Vega. He worked an overtime shift; that is, he started work with the swing shift at 4:30 p. m., the swing shift went off at 12:30 a. m., and he worked with the graveyard shift until 5:30 a. m. One Brown, who, at the time Nielsen started to work in the experimental department was a group leader (swing shift) and Nielsen's immediate superior, assigned Nielsen to the work of testing an airplane-engine radiator for leaks and instructed him as to the method of testing and the use of the apparatus furnished for such work. A few days before Nielsen was injured Brown was made a supervisor in the same department.

The method of testing was as follows: To one of the two openings of the experimental radiator was attached a duct at the end of which was a rubber hose. A disc of plywood three-quarters of an inch thick and about six inches in diameter, with a bolt in the center, was inserted in the hose as a plug and a metal band was clamped around the neck of the hose to keep the plug in place. To the other opening of the radiator was attached a duct through which air was forced into the radiator under a pressure of 15 to 20 pounds per square inch. At the time Nielsen was assigned to the work of testing the radiator such testing had been in progress for "one or two weeks." During this period and prior to the injury the plug had blown out "several" times (twice to the knowledge of the witnesses; on other occasions according to conversations which the witnesses had heard) with such force that it traveled from 30 to 60 feet upward and 75 to 100 feet horizontally. No one was hit by the plug on these occasions. After the first blowout the plug was beveled. The purpose of this change in design, according to the testimony of petitioner's chief safety engineer, was to make the metal clamps hold the plug more securely. After the plug blew out again, safety wire was fastened around the bolt of the plug and onto the adjusting bolts of the clamp.

At the time he assigned Nielsen to the work, Brown instructed him to wrap safety wire about the plug-bolt and clamps as an extra precaution and stated that the plug had

previously broken the wire when it blew out. Nielsen had worked on the radiator for about a week and had performed the test above described three or four times prior to the night of the 19th to 20th of January, when he was injured. On the evening of January 19, while he was working on the radiator, the wired plug blew out, broke the wire, "flew approximately 30 feet in the air and on an angle of about 60 degrees from the bench—about 30, 35 feet in the air . . . [and] horizontally across the department about 75 to 100 feet," and struck a railing which surrounded the office of the assistant foreman of the department, one Hauck. Hauck came to the railing and, according to the testimony of Nielsen and a fellow employe, said, "Blow it higher the next time." Hauck denied that he made such statement.

Brown testified that just before he left work at 12:30 a. m. on January 20 he warned Nielsen to "Be sure and put the wire on and not to get in front of the plug." Nielsen testified that he did not recall being told not to go in front of the plug. The safety engineer testified that Nielsen "wouldn't have to be in front of the plug to get hit" (meaning, apparently, not directly in front).

Nielsen also testified that after Brown and Hauck left work one Roberts, group leader (graveyard shift), "looked at the mechanism that was on the radiator and remarked what a poor condition and what a poor outfit it was for holding the air pressure in the radiator . . . and said, 'You better wire this a little bit better.' And I did wire it a little bit better."

Just before he was injured, Nielsen testified, he "put the clamps on and plugged up the ducts with apparatus and filled it with air pressure. That's the last thing I remember. . . . I don't remember putting the air pressure—I don't remember who put the air pressure into the ducts. . . . The last thing [I] remember was putting in the plugs and putting on this piece of broken wire." (The safety wire in use at the time Nielsen was injured had been previously broken and twisted together again.) The plug blew out and struck Nielsen in the face. As a result of the injuries sustained the right eye some months later was necessarily enucleated.

The evidence as to who initiated and carried out the measures intended to make the equipment safe is as follows: Brown testified that, after the plug blew out despite its changed design, he discussed with his immediate superior, Hauck, and with Nielsen methods of preventing another blow-

out and they determined to use the safety wire; that he did not discuss the problem with the department foreman, one Coverly, or with the safety engineer; "they were on the day shift and I was on the swing shift; I didn't see them but very seldom." As stated above, Roberts, group leader on the graveyard shift, also discussed the problem with Nielsen and advised the use of safety wire. Hauck, assistant foreman and Brown's immediate superior, testified that he knew the plug had blown out on two previous occasions; that after each of these blowouts additional precautions were taken. The chief safety engineer testified that after the first blowouts occurred he discussed the situation with Coverly, foreman of the experimental department, and with "one or two supervisors" but he did not examine the equipment; that the design of the plug was changed and the safety wire was added in attempts to meet the problem; and that he did not know that the safety wire had broken on any occasion previous to Nielsen's injury.

Hauck, as stated, was assistant foreman. "On the swing shift he was in charge of the department. His superior, on days, was Mr. Coverly," who "was supreme so far as the shop was concerned." Hauck's own testimony that on the swing shift he "was in complete charge of the department" makes it appear that he was invested with general discretionary power of direction and control of the experimental department on that shift. (See *Bechtel etc. Corp.* v. *Industrial Acc. Com.* (1944), 25 Cal.2d 171, 174 [153 P.2d 331], and cases there cited.)

██ This court, in the Bechtel case, *supra,* has recently rejected the view that any employe who has authority to give orders to other employes is necessarily, by virtue of such authority, an executive or managing officer or general superintendent. We must now reject the view that because a corporation's business is carried on in many departments, both night and day, the corporation is insulated from responsibility for the serious and wilful misconduct of a supervisory employe to whom it has delegated general discretionary power of direction of a relatively small but integrate department during one shift. The showing made here meets the test declared in the Bechtel case.

██ Serious and wilful misconduct is conduct which the employer knew, or should have known, was likely to result in serious injury or which evinced reckless disregard for the

safety of the employe. (*Parkhurst* v. *Industrial Acc. Com.* (1942), 20 Cal.2d 826, 829-830 [129 P.2d 113], and cases there cited.) ■ The commission did not exceed its jurisdiction (the legally sustainable import of the evidence) by impliedly finding that Hauck should have known that the plug probably, or at least possibly, would again blow out with great force, that he failed to take reasonable action to substantially alleviate the danger, and that in so doing he evinced a reckless disregard for the safety, not only of Nielsen, but also of the other employes of the department.

Although Hauck testified that, so far as he knew, the plug had not blown out after it was wired until the occasion on which Nielsen was injured, it appears from other testimony that the plug was wired when it blew out and struck Hauck's office a few hours before the injury occurred. After the inadequacy of the plug as then arranged was thus forcibly demonstrated to Hauck, he did nothing whatsoever to protect the workers. So far as appears, he left work without informing the assistant foreman in charge of the department on the graveyard shift of the danger incident to the use of the plug. The inadequacy of the precautions of beveling and wiring the plug was obvious to Roberts, group leader on the graveyard shift, who "remarked what a poor condition and what a poor outfit it was." Yet the only attempt at additional precaution was Roberts' suggestion, adopted by the employee, to wire the plug "a little bit better." Further wiring, in the circumstances, could well have been found to be a precaution not reasonably commensurate with the danger incident to the blowing out of the plug. And even the suggestion to "wire it a little bit better" apparently came from a minor supervisory employe.

Petitioner argues that the evidence shows that "the very work being done was of an experimental nature. No custom had been established as to how the work was to be done. It was a procedure of trial and error." The evidence indicates that in production departments certain radiators were tested under air pressure of 12 pounds per square inch, using an unwired metal plug designed for such purpose because "they do it all the time"; in testing other radiators, smaller than the one on which Nielsen was working, water rather than air pressure was used. The safety engineer testified that no standard technique had been developed for the testing work which Nielsen did. We fully realize that to

require an employer, in order to avoid responsibility for wilful misconduct, to, in effect and under all circumstances, ensure the safety of employes engaged in experimental work would tend to limit research and development, and we imply no such requirement. But we are satisfied that the evidence here is sufficient to warrant the commission's conclusion that the existence of a danger which, by the use of reasonable precautions, could have been largely, if not entirely, eliminated was demonstrated to petitioner and that substantially nothing was done to guard against such danger.

The evidence above summarized supports the finding that the injury was proximately caused by the omission of the petitioner to provide a secure plug. "It is well settled that the question whether serious and willful misconduct of the employer caused the employee's injury is essentially one of fact, and that if there is any substantial evidence to support the findings of the commission its award will not be disturbed." (*Parkhurst* v. *Industrial Acc. Com.* (1942), *supra*, 20 Cal.2d 826, 831.) ■ The negligence, if any, of Nielsen in failing to procure new safety wire and in getting in the path of the plug, is not material to this inquiry. (Lab. Code, § 3600; *Western Pac. R. Co.* v. *Industrial Acc. Com.* (1924), 193 Cal. 413, 421 [224 P. 754]; *Associated Indem. Corp.* v. *Industrial Acc. Com.* (1941), 18 Cal.2d 40, 44 [112 P.2d 615]; *Smith* v. *Industrial Acc. Com.* (1941), 18 Cal.2d 843, 850-851 [118 P.2d 6].)

■ Petitioner relies upon *Taylor* v. *Industrial Acc. Com.* (1940), 38 Cal.App.2d 75, 80-81 [110 P.2d 511], wherein it is declared that a finding that " 'Said injury was caused by the serious and wilful misconduct of the employer' . . . is totally inadequate, and does not amount to a finding at all. It is a mere conclusion of law. Findings should be so framed that the defeated party can specify intelligently the particulars in which they are not supported by the evidence, where such point is made. . . . The findings must disclose the theory upon which they are grounded when the issue is controverted." In the Taylor case, however, as pointed out in *Dawson* v. *Industrial Acc. Com.* (1942), 54 Cal.App.2d 594, 600 [129 P.2d 479], "Several distinct acts were alleged and relied upon by the petitioners as proof of wilful misconduct" and the finding "left an uncertainty as to what particular alleged acts or conduct were deemed to constitute wilful misconduct." In the instant case the sole act on which the em-

ploye relies as constituting serious and wilful misconduct and on which evidence was introduced is, as alleged in his claim for increased compensation, "putting a plug in the radiator duct . . . although it was known by said employer that the plug was faulty and would likely blow out." The finding is sufficient because it can be made certain by reference to the record. (*Ethel D. Co.* v. *Industrial Acc. Com.* (1934), 219 Cal. 699, 708 [28 P.2d 919]; *Dawson* v. *Industrial Acc. Com.* (1942), *supra.*)

For the reasons above stated the award is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.