[L. A. No. 20142. In Bank. Dec. 30, 1947.]

CALIFORNIA SHIPBUILDING CORPORATION (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and FRANK CORNIER, Respondents.

Thelen, Marrin, Johnson & Bridges and Gardiner Johnson for Petitioner.

R. C. McKellips, Edward A. Sarkisian and John A. Rowe, Jr., for Respondents.

SCHAUER, J.—Respondent Frank Cornier sustained compensable injuries while in the employ of petitioner California Shipbuilding Corporation. He claimed and respondent commission awarded the increased compensation provided by sec-

tion 4553 of the Labor Code for an employe injured by reason of the serious and wilful misconduct of an employer. ■ To sustain the extra compensation, it must be established that the employer's misconduct is both serious and wilful (27 Cal. Jur. 441, § 118) and, where the employer is a corporation, such misconduct, before it can be attributed to the corporation, must be proved to be that of "an executive, managing officer, or general superintendent thereof" (Lab. Code, § 4553).

■ The commission found that "Said injury was proximately caused by reason of the serious and wilful misconduct of the employer, by and through its managing officers, in violation of Labor Code Sections 6400-6404 inclusive, in that said employer cut a hole in the deck of a ship, and: (a) Failed to have proper or any lights illuminating or making visible the said hole and the deck immediately adjacent thereto; (b) Failed to guard the said hole with proper or sufficient guard rails; (c) Failed to notify or warn the applicant that said hole had been cut in said deck, with knowledge that applicant was working in the vicinity of and had occasion to be at or near the said hole; (d) Failed to take reasonable precautions and/or to adopt and use methods and processes reasonably adequate to render the employment and place of employment safe." Petitioner urges that there is no evidence that any of its "managing officers" created or knew of or wilfully maintained the hazardous condition described in the finding and that such finding is defective because it does not specify the agent or agents of petitioner to whom the commission attributed misconduct. Such a finding is not necessarily fatally defective merely because of its form (*California Shipbuilding Corp.* v. *Industrial Acc. Com.* (L. A. 20140), *ante,* p. 270 [188 P.2d 27]), but examination of the record in this case neither makes it adequately certain nor reveals any tenable factual theory of the commission which could support such general conclusionary finding.

A number of supervisory employes* with various degrees of authority were referred to by name or job classification in

---

*Among the employes mentioned in the testimony who had, or possibly exercised, some supervisory authority, are Frank J. Beckner, "hull foreman" on the graveyard shift, who was Cornier's foreman; John Lenan, foreman of one Kennedy (Kennedy was an electrician on the graveyard shift whose duty was to "fix lights"); James L. Rollins, "safety inspector" on the graveyard shift, who did not know of the existence of the hole until after Cornier's accident and who, immediately

the testimony adduced by the applicant for compensation. The applicant tried diligently to establish a basis for a finding that there was wilful misconduct by someone and to fix responsibility for such misconduct, if any, upon one or another of the mentioned employes.. In such a case it is particularly unfair—both to the employer who seeks to attack the award and to the applicant who seeks to uphold it—for the commission not to disclose in its findings the particular factual basis on which the award rests. Nor should the reviewing court be expected to search the record and from a maze of uncertain, loose and conflicting testimony relative to various persons and events, evolve some factual theory of wilful misconduct by someone, perhaps unthought of by the parties in interest, which could possibly be supported by some evidence in order to sustain the award. (See *Western Indemnity Co. v. Pillsbury* (1915), 170 Cal. 686, 705 [151 P. 398].)

Cornier was injured while working at night (graveyard shift) on a ship under construction. He fell into a rectangular hole, 4 x 12 feet in size, in a part of a deck which, while there were lights on either side, was itself in a shadow and relatively dark. He testified, "There was light around but not where I fell, because there was no light right at that particular place, right at that particular place." Around three sides of the hole, about 2 feet from its edges, was a single guard rail, fastened to "uprights," about 3½ feet above the deck. The fourth edge of the hole was immediately adjacent to and fully protected by a bulkhead, but between the bulkhead and the rail on either side were openings, one of which was about 2 to 6 inches wide and the other about 12 inches wide. (The size of the wider opening appears from a photograph showing a ruler

after such accident, "had the hole covered with boards"; Mr. Cassell, "the 24-hour superintendent"; C. E. Daniels, who worked on the graveyard shift and who was variously described as "senior foreman," "ship foreman . . . over the entire boat and all the men on the boat," and "senior welding foreman" with "two foremen under him who had the jurisdiction over the welders"; Tom Meeks, welding foreman on the swing shift; A. T. Brant, "senior foreman on one of the ways" during the day shift; Mr. McGovern, chipper foreman on the day shift; Henry Forehand, who was a tacker and to whom Warterfield reported an earlier accident; M. L. Warterfield, a shipfitter, who' "sent" Forehand to notify someone concerning the lighting conditions; and the following men whose names the witnesses could not recall: senior welder foreman and welder foreman on the day shift; burner foreman, fitter foreman, shipwright foreman and stage rigger foreman' on the day and swing shifts; chipper foreman on the swing shift; senior fitter foreman on the day shift; burner leadman on the swing shift.

held across the opening. The accuracy of such photograph was accepted by the referee and is not disputed.) Cornier, according to his testimony, fell into the hole without having seen or touched the rail. The referee in this connection stated, "It does not seem probable that applicant passed through the 12-inch aperture between guard rail and bulkhead, for he weighed approximately 190 pounds at the time of injury and had no recollection of touching anything just before falling; it is more likely that he was stooping, looking on the darkened deck for equipment, and passed underneath the rail. . . ." There were lights installed in the galley beneath the hole and "There was lighting supposed to be in there," but the lights were not turned on until after the accident. They were turned on a few moments after the accident, by the electrician Kennedy, not because of knowledge of the accident or hazard (he then had none) but in regular course of duty on "a routine inspection." As for the occasion for Cornier's going to the part of the ship where he fell, he testified "I was up on the deck above from where I fell and the foreman sent me down to go aft and fur up a strong back and I was on the next deck and I was looking for material to work."

The hazardous condition appears to have been created by a concurrence of four elements: (1) The cutting of the temporary hole in the deck; (2) The fact that the hole was in a shadow with bright lights on either side; (3) The guard rail was inadequate to prevent a stooping person from passing under it; (4) The lights which had been installed in the galley below the hole were not turned on at the time in question.

The first element—the temporary hole—was created on a shift (day or swing) previous to the one (graveyard) during which Cornier was injured. There is no evidence that any managing agent of petitioner on the day or swing shift was responsible for or knew of such condition, or that the condition was one which in the regular course of operations over an extended period of time frequently recurred. On the contrary, this was the first time, at least in the experience and procedure of the parties here concerned, that such a hole had ever been cut in a ship. It was cut through the deck above the galley in order to provide an aperture through which a stove could be moved for installation. As stated by the referee, "No Safety Order [in effect at the time of the accident] appears in terms to apply to the situation here pre-

sented, for the hole cut in the deck constituted an entirely new procedure, and the hole was temporary in its duration, being only for the purpose of access to the galley, and thereafter would be closed.''

One Beckner, ''hull foreman'' of the graveyard shift, had authority over chippers, burners, riggers, shipfitters (including Cornier) and shipwrights. One Rollins was safety inspector on the graveyard shift. Neither of these men learned of the existence of the dangerous condition until after Cornier was injured and it does not appear that their failure to discover it was due to remissness in the performance of their duties. One Daniels was also a foreman on the graveyard shift. The evidence as to his title and the nature and extent of his duties and authority and his knowledge of pertinent circumstances, is slight and conflicting and insufficient to establish a basis for the serious and wilful misconduct award. He is variously referred to as the ''senior welding foreman'' or ''ship foreman . . . over the entire boat and all the men on the boat'' or ''senior foreman.'' At the times in question he was not on the ship but in his office, which was ''off the boat altogether.'' At about 1:15 p. m. Daniels was told by a worker that another employe, one Billie, had fallen into the hole. Cornier's highly uncertain testimony as to the time of his fall was that he fell ''I imagine about between two and three, somewhere around that, one-thirty, somewhere around that time.'' So far as the referee's report discloses, it did not appear to the referee, and from the transcript it does not appear to us that Daniels learned of the earlier accident or of the dangerous condition in time to have had such condition corrected, if he had authority to do so, or to notify one with such authority, if he did not, so as to have prevented the occurrence of the accident to Cornier; certainly, it does not appear that the finding of ''serious and wilful misconduct'' is, or reasonably could have been, based on any act or dereliction of Daniels.

The second element going to make up the hazardous condition—the fact that the hole was in a shadow intensified by the bright lights on either side—would have been inconsequential here if the deck had been in its normal condition and would have been nonexistent or overcome if the galley lights had been turned on. As to the relationship and significance of the guard rail and the lights in the galley—the third and fourth elements of the hazardous condition—the

referee aptly stated that "if the area had been lighted, it is probable that the existing guard would have been sufficient."

The referee reported and the commission relies on the theories that some unknown and unidentified foreman or superintendent on the day or swing shift "must have known" of the dangerous condition and that hull foreman Beckner had a "duty" to discover it and that whatever managing officer in charge did know of it or was charged with knowledge of it, wilfully maintained it—theories unsupported by the evidence and entirely too uncertain and nebulous, in any event, to sustain the increased award. These views of the commission have no more support in the evidence than the equally possible surmises that the dangerous condition existed because some unidentified swing shift employe negligently failed to turn on the lights which the management had installed in the galley, or because some accidental vibration, without fault of anyone, caused such lights to go out. In basing its award on speculation rather than on evidence, the commission exceeded its jurisdiction.

The award of increased compensation is annulled.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

It is difficult to ascertain whether the majority opinion holds that the evidence is insufficient to establish serious and wilful misconduct or that such misconduct, although established, was not shown to be chargeable to a managing officer. In either event I am convinced the evidence is sufficient. Moreover, I wish to point out that the condemnation of the finding of such misconduct, for failure to designate the managing officer chargeable therewith, is erroneous and contrary to authority.

Turning first to the evidence, my review of the record reveals that the facts are much stronger in support of the commission's finding than those presented in the majority opinion. It must be remembered that if there is any evidence to support the findings of the commission its award must be affirmed, and only the evidence favorable to that result need be considered. Conflicts may be ignored.

The record discloses that a hole was cut in the deck of the

ship immediately over the galley, to be used in placing a stove in the galley. The employee, Cornier, was working on the graveyard shift, that is, from 12:30 a. m. on. There is abundant evidence that the area around the hole was *dark*. There was no light in the galley below the hole. There was a *single* guard rail about 3½ feet high on three sides of the hole. It had no toe stop at its bottom. The fourth side of the hole faced the hull of the ship. There was no guard rail along that side. The two side guard rails failed by *2 feet* to reach the hull of the ship, thus leaving a 24-inch space where the hole was unguarded. There is evidence by several witnesses that the space was of that size. (The figures of 2 inches at one end and 12 inches at the other, given in the majority opinion are the result of choosing evidence less favorable to the finding.) *We have therefore a clearly dangerous and unsafe condition at the place of work of the employees.* The safety laws condemn such a condition. "Every employer shall furnish employment and a place of employment which are safe for the employees therein." (Lab. Code, § 6400.) As I read the majority opinion it concedes that if that condition were known to a "managing officer" of a corporate employer, and nothing was done to rectify it, a case of serious and wilful misconduct is made out. This brings us to the question of whether such an officer was in that position in the case at bar.

That question must be answered in the affirmative for several reasons: First, some such officer *must have known of that condition.* The employer, although undoubtedly in a position to do so, offered no evidence as to when or under whose direction the hole was cut. Being able to produce such evidence, but failing to do so, it will be presumed that if it were produced it would have been unfavorable to it. The employer offered only one witness, the safety inspector for the graveyard shift on which the employee was injured. It offered no evidence as to who the various managing officers were, or the nature of their powers. No evidence was adduced by it as to who had charge of cutting the hole or placing guards around it. It made no showing as to the managing officers and their powers during the shifts preceding the accident. We may assume, therefore, that the hole had been cut *at least* at the time of the swing shift, immediately preceding the graveyard shift. That would mean that the darkened hole with an inadequate guard rail had existed during the hours of darkness from 6:00 p. m. to 12:30 a. m. and thereafter to the time

Cornier was injured. The lights below the hole were ignited after the accident but they were not turned on at that time as stated in the majority opinion. They were then "hooked up" from which we may infer that they were totally disconnected during all the previous time. It is inconceivable that no managing officer would fail to discover the hazard before the accident. At least it is inferable that one did. It is not to be supposed that such officer or officers wilfully avoided the ship and failed to discover the danger or shut their eyes to it. If they did, then that in itself would be wilful misconduct by the appropriate person. Therefore, we have a logical basis for saying that some such officer must have known of the condition and failed to correct it. This is not a theory, as expressed by the majority, as "uncertain," "nebulous" and "unsupported by the evidence."

· There is an additional reason why a managing officer must have known that the hole was not properly guarded. Provision was made in the blueprints for the hole, and we may assume that it was ordered cut by a managing officer, and that such person would also supervise or direct the placing of the guard rails. It is reasonable to infer, as conceded by the majority, that Cornier fell by reason of crawling under the guard rail. The guard rail failed to meet the safety rules on the subject. Such rules provide: "(a) All deck . . . openings eighteen (18) square feet or over in area shall be guarded by *standard guard railings* and six (6) inch toe boards until replaced by ships equipment." "Standard Guard Railing" means "a *two rail railing* having a top rail whose upper surface is from forty-two (42) to forty-five (45) inches above the upper surface of the staging, platform or runway being protected and whose second or mid-rail is located half way between the top-rail and the top surface of the staging, platform or runway." [Emphasis added.] Here the guard rail had *no middle* rail and *no toe board*. If there had been one, Cornier would not have fallen, even if it were dark. The insufficient guard rail must have been installed or at least seen by a managing officer.

Second, another person (Billie Lovett), a woman, had fallen into the same hole before Cornier's mishap and that incident was known to Daniels, the ship foreman, who failed to take any action. It may first be noted that there is ample evidence showing Daniels to be a "managing officer." His

headquarters were in a shack not on board the ship. Warterfield, an employee on the graveyard shift, testified: "Did you have any other supervisor or superintendent there? A. There was the *ship foreman, Mr. Daniels, over the entire boat and all the men on the boat.*" Certainly, the ship was one separate project of the employer's work and the man in charge of it and *all* the men thereon, qualifies as a managing officer. At the time Billie Lovett fell into the hole the lighting conditions were the same as at the time of Cornier's fall—it was dark. The majority opinion states that she fell 20 to 30 minutes before Cornier did. (Again it is taking evidence unfavorable to the applicant to whom the award was made.) Forehand, an employee, testified that he went to work at 12:30 a. m and Billie's fall occurred 30 minutes later, that is, 1 a. m. He immediately told Daniels of the incident. Cornier testified he fell between 2 a. m. and 3 a. m. Taking the later figure, as we must do, an hour and 45 minutes to two hours elapsed between the time Daniels knew of the condition and Cornier's fall. How can this court say, *as a matter of law,* that it was not wilful misconduct for Daniels to fail to rectify the dangerous condition during that time? The answer is, that we are bound by the commission's determination. *Ethel D. Co.* v. *Industrial Acc. Com.,* 219 Cal. 699 [28 P.2d 919], is closely in point. There this court affirmed a finding of wilful misconduct where the employee fell from a ladder due to insecure handholds, stating at page 703: " 'Serious misconduct' of an employer, within the meaning of the statute . . . was defined in *E. Clemens Horst Co.* v. *Industrial Acc. Com.,* 184 Cal. 180, 188 [193 P. 105, 108, 16 A.L.R. 611], to be 'Conduct which the employer either knew, or ought to have known, if he had turned his mind to the matter, to be conduct likely to jeopardize the safety of his employees.' In the same case it was said that, in order that serious misconduct should also be wilful misconduct within the meaning of the statute, the appearance of circumstances surrounding the act of commission or omission which 'evince a reckless disregard for the safety of others and a willingness to inflict the injury complained of' would amount to sufficient proof of knowledge by the employer of the unsafe condition of the premises to fulfill the requirement that the employer charged with wilful misconduct shall have knowledge that the act of commission or omission is wrongful. It may be conceded that, generally speaking, the mere failure of an employer to comply literally

with the requirement of a safety order of the Industrial Accident Commission does not of itself justify a finding that the employer is guilty of serious and wilful misconduct. In the final analysis, the circumstances presented by the evidence in any case will be determinative of the question of whether or not the employer's act may properly be characterized as 'serious and wilful misconduct.' What would amount to no more than simple negligence in one situation may well be denominated serious and wilful misconduct in another. (*Hoffman* v. *Dept. of Indus. Relations,* 209 Cal. 383, 390 [287 P. 974, 68 A.L.R. 294].) In the instant case the continued presence upon and about the derrick of so slippery a substance as crude oil would seem to point unmistakably to the necessity of strict compliance with the provisions of the commission's Safety Order 1618 and to suggest to the person in charge of the oil-well that a ladder utilized by workmen should be provided with secure handholds rather than with such makeshift supports as the end of a bolt or an upright post supporting a railing. At all events, the question of whether, under the circumstances, the employer should have known that the failure to provide more secure and more readily accessible handholds would be so likely to jeopardize the safety of employees as to evince a reckless disregard for their safety and a willingness to inflict injury, was a question of fact to be determined by the referee to whom the evidence in the case was submitted.''

I have heretofore referred to the majority decision's criticism of the commission's findings for failure to name the managing officer chargeable with the wilful misconduct. I cannot agree with that criticism. A liberal construction should be given to the findings and the commission should not be required to speculate upon which person this court might decide was the managing officer under the evidence. The holding in the majority opinion is, in this respect, directly contrary to *Ethel D. Co.* v. *Industrial Acc. Com., supra* (the facts involved in that case are stated above). In that case the finding was merely that the "injury was caused by the serious and wilful misconduct of the employer, a corporation.'' The words managing officer, etc., were not even mentioned. In holding the finding sufficient this court said at page 709: "The statute which authorizes the recovery of additional compensation provides, as heretofore noted, that where the employee is injured by reason of the serious and

wilful misconduct of the employer 'or if a corporation, on the part of an executive or managing officer or general superintendent' additional compensation may be awarded. It is obvious that a corporation is incapable of wilful misconduct. Wilfulness presupposes mentality. A corporation is a purely legal fiction possessing neither the physical nor mental attributes of a human being. The record herein shows that H. F. Owen was general manager of the petitioner corporation at the time the accident occurred and that from 1913 until 1929 he was superintendent of petitioner and that all properties of petitioner were under his supervision as superintendent. It does not appear from the record that, at any time material to the inquiry herein, any person other than Owen exercised any control or supervision over the oil well where the accident occurred. It is thus apparent that the only individual who could be charged with serious and wilful misconduct was the man who had entire supervision and control of the oil well. *Since the commission's finding can so readily be rendered definite and certain by reference to the record, no difficulty is encountered in declaring that the finding is not fatally defective in the respect claimed by petitioner.*" [Emphasis added.] Likewise, in the instant case, the dangerous condition created by the hole must have been the result of action or lack of action by a managing officer. Merely because there were several persons who might be said to occupy that position cannot alter the result. The discussion in the majority opinion in effect overrules the Ethel Company case without so stating.

The majority opinion in effect disregards and nullifies the provision of the Labor Code relative to liberal construction. Section 3202 of that code provides: "The provisions of Division IV and Division V of this code shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." The provision here construed (§ 4553) is found in division IV of the Labor Code and is therefore subject to the provisions of section 3202 of that code above quoted.

I have heretofore had occasion to call attention to the practice of some of the members of this court giving lip service to the last-cited provision of the Labor Code by making reference to it and then construing the provisions of the act so as not to extend but to deny their benefits to persons injured in the course of their employment. (See dissenting opinion,

*Aetna Cas. & Surety Co.* v. *Industrial Acc. Com.,* 30 Cal.2d 397 [182 P.2d 159].) Such decisions render section 3202 meaningless and of no effect whatsoever.

The word "liberal" is defined in Webster's International Dictionary, second edition, as follows: "Not strict or rigorous; not confined or restricted to the literal sense; free; as, a liberal translation of a classic. Not narrow or contracted in mind; broad minded." While it is true that a provision for the liberal construction of a statute should not be interpreted to mean that a court should engraft upon a law something that has been omitted which the court believes ought to have been embraced therein, or to omit something therefrom which the court thinks should have been omitted, I think it is fair to state that such a provision is intended to expand the meaning of the statute to meet cases which are clearly within the spirit or reason of the law, or within the evil which it was designed to remedy, provided such an interpretation is not inconsistent with the language used, and it resolves all reasonable doubts in favor of the applicability of the statute to the particular case.

Applying this interpretation to the case at bar, can there be any doubt that the conduct of those who left the hole in question insufficiently guarded and the area unlighted, knowing that other employees might traverse that area, were guilty of serious and wilful misconduct? I think this question must be answered in the negative; that is, that serious and wilful misconduct was established beyond doubt. This question being answered in accordance with the findings of the commission, the next question is, does the evidence show that an executive, managing officer, or general superintendent of the employer corporation is chargeable with leaving the hole in that condition? The answer to this question is found in the testimony of the witness Warterfield that Daniels, the ship foreman, who had supervision over the entire boat and all the men on the boat, had knowledge of this condition from the time Billie Lovett fell through the hole, which was about 1 a. m., and Cornier testified that he fell through the hole between 2 and 3 a. m. Certainly, a liberal construction of section 4553 of the Labor Code with the purpose of extending its benefits for the protection of Cornier would lead to the inevitable conclusion that Daniels was a "managing officer" and that serious and wilful misconduct was chargeable to him

in failing to comply with the safety rule after he learned that the rule had been violated by those who had placed an insufficient guard rail around the hole in question.

In my opinion, it is not necessary to resort to the legislative mandate of liberal construction contained in section 3202 of the Labor Code to sustain the finding of the commission in this case, but I am simply calling attention to this provision so that its existence may not be entirely lost sight of by this court.

In my opinion, the award should be affirmed.

Respondent's (Industrial Accident Commission) petition for a rehearing was denied January 29, 1948. Carter, J., voted for a rehearing. Shenk, J., did not participate on petition for rehearing.