[Civ. No. 8070.   Third Dist.   Nov. 6, 1951.]

NELSON H. CHICK et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION, IRA M. ROWELL et al., Respondents.

Leonard, Hanna & Brophy for Petitioners.

T. Groezinger, Edmund J. Thomas, Jr., Robert Ball and McCarthy, Johnson, O'Hara & Skaife for Respondents.

VAN DYKE, J.—This is a proceeding in certiorari to review awards of the Industrial Accident Commission whereby there was granted to Ira M. Rowell and Otto Schuck additional compensation because they were found by the commission to have been injured by reason of the serious and wilful misconduct of their employer. The employer was engaged in constructing a steel arch bridge with concrete deck over the Smith River in Del Norte County. The steel work had been completed and the employer was engaged in laying the deck. This was being done progressively a section at a time. The sections were called bays and when a bay was completed the forms used in constructing it were stripped off and the material used in constructing the next bay. In order to conduct this stripping operation the employer made use of a suspended platform underhanging the bridge at a distance of about 4 feet. Below the platform at the time these workmen were injured was a drop of about 60 feet to the bed of the river. At the time of the injury the platform failed and the men had been catapulted into the river, receiving injuries. There was at no time any dispute concerning their right to compensation, but the men applied to the commission for an award of added compensation. Hearings were conducted at which a great deal of evidence was taken and the commission's referee recommended that the application for added compensation be denied, as he found that the men had failed to prove the basis of their claims therefor. He absolved the employer from the charge made. His findings and recommendation for denial of further award went before a panel of the commission which followed his recommendations and entered findings denying the added compensation applied for. The panel granted a petition for rehearing. Upon reconsideration findings were adopted upholding the contentions of the men that they were injured by reason of the serious and wilful misconduct of the employer in that the employer through its general superintendent knowingly and wilfully failed to furnish a safe

place of employment, did knowingly and wilfully fail to use means and methods reasonably required to render the place of employment safe and did knowingly and wilfully permit the men to go and be in an unsafe place of employment. More specifically, the commission found that at the time of injury the employer, through its general superintendent, knew or should have known had it turned its mind to the fact that the combined weight of stripped materials and men engaged in stripping operations, plus the weight of the platform, exceeded the load, weight, and stress bearing capacity of the platform, thus making the prosecution of the work dangerous to life, limb and safety; that the employer knew or should have known had it turned its mind to the fact that the load, weight and stress bearing capacity of the platform was insufficient to sustain this combined weight; that the employer also knowingly and wilfully failed to exercise the degree of prudence and caution which it would have exercised had it turned its mind to the fact in that it required and directed its employees to work in stripping materials upon the platform furnished without first giving all necessary orders and instructions upon the process to be followed, the number of employees to be engaged therein and the load weight or stress capacity of the platform. Generally, the commission found that at the time of the injury and immediately prior thereto the employer, through its general superintendent, wilfully failed to comply with the requirements of sections 6400 to 6403 inclusive of the Labor Code and each of them. These sections provide that employers shall furnish a safe place of employment, shall use safety devices and safeguards and adopt practices and processes reasonably adequate to render employment and the place of employment safe and shall generally do anything reasonably necessary to protect the life and safety of employees, it being expressly forbidden to an employer to require or permit an employee to go or be in any employment or place of employment which is not safe.

In laying the concrete deck of the bridge the length of the proposed deck was divided into 12 to 14 bays and in turn each bay was divided into five or six panels across the width of the bridge. One bay was poured at a time, using wooden forms in place to contain the concrete until it set. Forms remained in place about seven days and were then stripped off to be reused. This stripping operation was performed by the men being on the suspended platform, which consisted of three 4 x 4 timbers about 18 feet long, known as needle beams, spaced

about 15 feet apart, with planking laid on to form the working platform. Each beam was suspended at three points—at the ends and in the center—the outside beams by means of three ropes. The center beam was suspended at one end and in the middle by ropes, but the other end rested upon a structural part of the bridge itself. The material for the platform was selected by the superintendent of construction and the general foreman. The superintendent designed the platform, adopting the needle beam type of platform after consultation with and the approval of the representative of the safety department of the Division of Industrial Relations of this state. There is some conflict as to the load capacity of the platform, it being given in one instance as 4,000 pounds and in another as approximately 5,000 pounds. When the injuries occurred five men were working on the platform. When nearly all of the panels of the bay had been taken down and laid on the platform the center beam failed at a point about 18 inches inside the point where it bore on the steel of the bridge. It was testified that at that time there was a total load on the platform of almost 5,000 pounds. There was testimony that, in stripping, timbers of considerable weight were sometimes dropped from the underside of the bridge onto the platform, a drop of 4 feet, and that the shock weight of such falling material would be about eight times the actual weight thereof.

The scope of a review of an award of the commission has been frequently stated and is not disputed here. It is not necessary to restate it. Adequate statements thereof will be found in such cases as *Bethlehem Steel Co.* v. *Industrial Acc. Com.*, 23 Cal.2d 659 [145 P.2d 583], and *Parkhurst* v. *Industrial Acc. Com.*, 20 Cal.2d 826 [129 P.2d 113]. ■■ And these cases also hold that the question of whether an injury has occurred by the serious and wilful misconduct of an employer is essentially one of fact, so that the commission's determination will not be disturbed on review if it has any evidentiary support; that the failure of an employer to comply with the quoted sections of the Labor Code, if knowingly and wilfully done, constitutes serious and wilful misconduct which has long been defined as "conduct which the employer knew or should have known, if he had turned his mind to the matter, to be conduct likely to jeopardize the safety of his employees." (*E. Clemens Horst Co.* v. *Industrial Acc. Com.*, 184 Cal. 180, 188 [193 P. 105, 16 A.L.R. 611].)

■ That the question here presented is a close one is well evidenced by the contradictory decisions made while the pro-

ceedings were before the commission, its panel and its referee, and certainly a finding by the commission that the injuries were not suffered by reason of serious and wilful misconduct of the employer would have been amply supported. But when we have said this we think we have said all that can be said in favor of petitioner here, which is to say that the record presents an issue of fact and not of law and that the findings ultimately made by the commission are substantially supported. Disregarding conflict, as we must, it appears from the evidence that on the morning of the accident the superintendent and the general foreman and six workmen, including the applicants before the commission, gathered at the site of the work and that the foreman then, in the presence of the superintendent, ordered the men to go to work stripping forms. Previously some, if not all, of this same crew, had engaged in stripping forms and had followed a process or routine whereby from two to four men would go upon the platform and engage in stripping work, while one or two would be upon the deck and would there be engaged in receiving stripped material handed up from the platform by the men below. The result of this would be that there would not at any time be an accumulated load upon the platform which would closely approach its loading capacity. Nevertheless, it also appeared that although the superintendent and the general foreman who had selected the material for, and designed, the platform, and superintended its assembly were fairly chargeable with knowledge of the loading capacity, yet none of the workmen were ever told that this capacity was only four or five thousand pounds and that, therefore, stripping operations should be conducted within the safe limits of that capacity. It can be fairly inferred from the record that the failure of the platform was solely caused by overloading. The platform was estimated to have weighed about 1,650 pounds, each panel to be stripped weighed about 520 pounds, and the five men who were on the platform when it failed weighed about 850 pounds, a total of about 5,000 pounds. Having constructed the platform and knowing the load capacity, whether that be taken as 4,000 or 5,000 pounds, both the superintendent and the general foreman knew or should have known, had they turned their minds to the matter, that if the men did what they in fact did do—strip down the five panels before sending any of the material aloft—the accumulated load would either exceed or dangerously approach the load capacity of the platform. The record supports the inference that when the men went to work the superintendent

and general foreman, had they looked, could have seen that only one man was on the deck, leaving five working on the platform and that the material was not going up, hence was accumulating. This situation obtained for about 45 minutes before the platform failed, during which time at normal stripping speed all of the panels would have been lowered to the platform. In view of these factors and of the failure to give specific warning against doing what the workmen did, we think the commission is supported in its findings hereinbefore set forth; that, all things considered, the men were sent to a place that was not safe and that this was knowingly and wilfully done within the meaning of those words as they have been defined by the courts in the cases referred to.

Petitioners argue that these were skilled workmen and must be considered as having known the proper and safe way of doing the work and the danger of overloading the platform but we think that this would require of them a technical knowledge of the breaking points of the various members of the platform which they did not have, but of which the superintendent at least was well informed.

The awards are affirmed.

Adams, P. J., and Peek, J., concurred.

The opinion was modified to read as above printed on November 29, 1951.