[S. F. No. 20536. In Bank. Jan. 31, 1961.]

R. L. KEELEY, JR., et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION and DENNIS HENRY, a Minor, etc., Respondents.

T. Groezinger and Loton Wells for Petitioners.

Everett A. Corten and Emily B. Johnson for Respondents.

PETERS, J.—Dennis Henry was injured in the course and scope of his employment. His employers were the Keeleys. It is conceded that he is entitled to normal compensation. The commission, in addition, based on a finding that the Keeleys were guilty of "serious and wilful misconduct," awarded Henry the 50 per cent additional compensation provided for by section 4553 of the Labor Code.[1] By this proceeding, the Keeleys challenge that award.

Petitioners are rice farmers. Charles Tanner is their foreman. Henry is their employee. On October 15, 1957, Henry, in the course of his employment, was assigned to the job of running a rice bankout wagon. The purpose of a bankout wagon is to haul rice from the harvester in the field to the highway, where the rice is unloaded into trucks. The wagon is pulled by a tractor. The unloading operation is accomplished by two screw-type mechanisms known as augers which are run by a gasoline engine located at the front of the wagon. The tank containing the rice is opened and the rice falls into

---

[1]Section 4553 of the Labor Code provides, in part, as follows:

"The amount of compensation otherwise recoverable shall be increased one-half where the employee is injured by reason of the serious and willful misconduct of any of the following:

"(a) The employer, or his managing representative. . . ."

the horizontal auger running lengthwise at the bottom of the wagon. This auger moves the rice to the rear of the wagon and into a vertical auger contained in a pipelike structure. The vertical auger pushes the rice up and out into the truck. At the bottom of this vertical cylinder is an inspection plate or trap door which may be shoved upward within the cylinder to permit rice to drop out when the machinery becomes clogged.

On October 15, 1957, Henry picked up a load of rice at the harvester and hauled it to the highway to load it into trucks. He left the tractor engine running, started the bankout motor, engaged the augers and opened the tank so that the rice would fall into the horizontal auger. The rice started to flow but then became clogged, an occasional occurrence when the rice backs up in the horizontal auger. This caused the bankout motor to stop. Henry tried to relieve the congestion by re-starting the bankout motor and slipping the clutch that acti-vated the augers, but he was unsuccessful. Petitioners' fore-man, Charles Tanner, saw that Henry was having trouble and joined him at the wagon.

There is conflicting evidence as to what then happened. Henry testified that Tanner was angry because the machine had become clogged, and cursed at him. He testified that Tanner opened the trap door at the bottom of the vertical cylinder to expose the clogged auger and attempted to start the rice flowing through the augers by slipping the clutch, but the rice remained clogged. Tanner then, according to Henry, stopped the bankout motor, walked back to the trap door, knelt down and began pulling rice out of the auger pipe with his hand. He was interrupted by two workmen who asked him to straighten a header bar. Tanner then told Henry to ''Continue, I'll be back soon,'' or something to that effect, and left with the two workmen.

Henry got down on one knee, put his hand into the opening and started pulling out the rice. After about 10 minutes he heard the bankout motor start, and the augers started to move before he could get his left hand out of the pipe. He shouted and the machinery stopped, but his hand was caught in the auger. Henry could not see the bankout motor from his kneel-ing position by the pipe at the left rear corner of the wagon, nor could he be seen by anyone starting the motor. The tractor motor was still running, and the noise prevented Henry from hearing the cranking of the bankout motor before it started. The motor had been started by Tanner.

Tanner's testimony conflicted sharply with that of Henry. He testified that he was not angry because the bankout wagon had become clogged, and that he did not use foul language. He further testified that he did not put his hand into the opening in the auger pipe but merely opened the trap door and turned the auger back with a pipe wrench. Then he started the motor and slipped the clutch rapidly several times. From time to time he went to the back of the wagon to see how much rice had fallen out. He claimed that he knew nothing about any difficulty with a header bar and that he had not left the wagon until he went to get help after Henry was injured.

Tanner also testified that he thought Henry was right behind him when he started the motor, and that he had not asked Henry to do anything because there was nothing that he could do to help. He also stated that he believed that Henry was beside him during most of this operation but that he had not looked for Henry each time that he had engaged the clutch. He further testified that the accident did not happen immediately after the motor started but that he had slipped the clutch eight to twelve times before Henry shouted.

Tanner denied that he had ever used his hands to pull rice out of a clogged bankout wagon. He stated that he knew it was dangerous for someone to put his hand into the augers. He also claimed that the rice could not be removed in that manner. However, other witnesses testified that pulling the rice out by hand was a common method of unplugging an auger, and that they had used this method themselves and had seen others do so. A witness also corroborated that portion of Henry's testimony regarding his position at the moment that the motor was started the last time.

The referee and the commission believed Henry's testimony and disbelieved that of Tanner. That determination is binding upon this court. ". . . [W]here the evidence is in substantial conflict or is susceptible of conflicting inferences the finding of the commission, whether for or against the applicant, is final and it is our duty to uphold such finding [citation], and . . . questions as to the weight of the evidence and the credibility of the witnesses are for the commission . . . if there is any evidence, whether direct or by reasonable inference, which will support the commission's finding. . . ." (*Mercer-Fraser Co.* v. *Industrial Acc. Com.*, 40 Cal.2d 102, 114 [251 P.2d 955].) Therefore, the sole issue to be determined is whether the findings and the evidence justify the conclusion that the

employers were guilty of serious and willful misconduct as found by the commission.

The referee found that, although the foreman had not intentionally injured Henry, Tanner had used his hands to clean the auger and had then ordered Henry "to clean the auger with knowledge that applicant's hand might be in the auger when the machinery was started, [and] that injury might thereby result. . . ." The referee pointed out that the foreman had taken no precautions to protect Henry although he knew that he was leaving the boy in a position of danger. The foreman then forgot that Henry was cleaning the auger and started the motor without giving any warning. The referee discounted the issue of malice, of which there was some evidence in the record, and based his decision "on the theory that the foreman knowingly put the boy in a place of danger and then forgot that he was there."

The commission adopted these findings and based its award upon them. It did so in reliance upon the case of *Henry J. Kaiser Co.* v. *Industrial Acc. Com.*, 81 Cal.App.2d 818 [185 P.2d 353]. That case affirmed an award of additional compensation under section 4553 of the Labor Code. Factually, it is very similar to the instant case. There, the injured employee was a laborer in the screening and separating unit of a crusher plant. During a shutdown of the screening operations a foreman ordered the employee to enter a bin located beneath the screens for the purpose of cleaning out an accumulation of debris and clearing the screen of rocks which had clogged it. The employee was required to work in a bent over or prone position while performing this task. Just as he finished, the foreman, in a moment of forgetfulness, started the machinery. The employee hollered and the machinery was stopped immediately, but serious injuries were inflicted.

The Kaiser company foreman testified that he knew it was unsafe to work in the bins if the machinery was in motion, and that he had started the machinery only because he had forgotten that the applicant was working in the bin. Employees working beneath the screens could not be seen from the platform where the control buttons were located. The commission found that the foreman's conduct constituted serious and willful misconduct, and the District Court of Appeal affirmed. ▇▇▇ It stated:

"While forgetfulness of a known danger alone under some circumstances may constitute only negligence, in the present case there was more than inattention. *The sending of an*

*employee into, under or near machinery which, if it moves, will injure him, without providing some means of protecting such employee* other than the memory of the foreman when starting the machinery, he being in a position where he could not observe the peril of the employee, *was in and of itself sufficient* to warrant a finding of wilful misconduct by the commission." (Emphasis added.) (81 Cal.App.2d at p. 829; see also *Gordon* v. *Industrial Acc. Com.,* 199 Cal. 420 [249 P. 849, 58 A.L.R. 1374].)

The Kaiser case is obviously on all fours with the instant one. Petitioners contend, however, that it was impliedly overruled by *Mercer-Fraser Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d 102, and *Hawaiian Pineapple Co.* v. *Industrial Acc. Com.,* 40 Cal.2d 656 [255 P.2d 431]. They further contend that their conduct does not constitute serious and wilful misconduct under the standard established by the two cited cases, and that they are, as a matter of law, guilty of no more than gross negligence. Both contentions are without merit.

The Mercer-Fraser and Hawaiian Pineapple cases dealt with an entirely different problem than the one here involved. They simply held that an employer cannot be found guilty of serious and willful misconduct where he intentionally does an act or omits to do an act, with a wanton and reckless disregard of its possible result. (*Accord, Sutter Butte Canal Co.* v. *Industrial Acc. Com.,* 40 Cal.2d 139, 143 [251 P.2d 975]. See also *Vega Aircraft* v. *Industrial Acc. Com.,* 27 Cal.2d 529 [165 P.2d 665]; *Meek* v. *Fowler,* 3 Cal.2d 420, 425-426 [45 P.2d 194]; *Howard* v. *Howard,* 132 Cal.App. 124 [22 P.2d 279]; 8 So. Cal.L.Rev. 140, 144.) ▮▮▮ Both cases overruled language in several California cases to the contrary. Both cases simply held that willful misconduct cannot be found from the existence of a danger which the employer should have known *had he put his mind to it.* As was said in *Hawaiian Pineapple Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d 656, 663: "The [proper] standard requires an act or omission to which the employer *has* 'put his mind'." (See also *Mercer-Fraser Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d 102, 125.)

But neither case purported to disapprove the rule of the Kaiser case. Neither case involved, held or implied that an employer who intentionally places an employee in a position of known and obvious danger without taking any precautions for his safety could not be guilty of willful misconduct by reason of that fact alone. In fact the Mercer-Fraser case held quite to the contrary. There, a building under construction

collapsed, killing several construction workers and injuring others. The commission found serious and willful misconduct on the part of the employers, and made its award accordingly. This award was annulled precisely because there was no evidence that the employer, or his foreman, knew that the construction was unsafe, and the men were being placed in a position of danger. (See also *California Shipbuilding Corp. v. Industrial Acc. Com.*, 31 Cal.2d 278 [188 P.2d 32].) The majority opinion points out that the commission found that the foreman ''in good faith believed . . . that the method of construction being employed was sound and sufficient for the safety of all concerned . . . .'' (40 Cal.2d at p. 127.) The existence of the danger to the workmen was not obvious and observable. ''The situation here . . . involved technical matters and skilled, expert judgment . . . .'' (*Id.* at p. 118; *cf. Dawson v. Industrial Acc. Com.*, 54 Cal.App.2d 594 [129 P.2d 479].)

The Mercer-Fraser decision itself clearly recognized that willful misconduct is involved where the employer knowingly places the employee in a situation of obvious danger and takes no precautions to protect him. The court specifically stated that an employer *is* required ''to refrain from such deliberate, knowing and intentional failure to take safety precautions, whereby its employes were intentionally subjected to *known, serious, unnecessary and unreasonable* hazards . . .'' (emphasis added) (40 Cal.2d at p. 121), and that failure to comply with this requirement would justify a finding of serious and willful misconduct. ▪ When an employee is ordered to work upon a piece of machinery in such a manner that he will probably be injured if the machinery is started, and nothing is done to protect him against this hazard, the commission is justified in finding that he has been ''intentionally subjected to known, serious, unnecessary and unreasonable hazards'' and that the employer is thus guilty of serious and willful misconduct. (*Cf. Chick v. Industrial Acc. Com.*, 107 Cal. App.2d 292 [237 P.2d 8].)

The *Hawaiian Pineapple Co.* v. *Industrial Acc. Com.* case, *supra,* 40 Cal.2d 656, is also not in point. There a fork lift driver was injured when his vehicle was hit by a railroad engine. The injured workman was required to drive his fork lift back and forth across railway switch tracks which ran between the main plant and an associated warehouse. Certain precautions had been taken by the employer to avoid accidents at the crossing. Signs with crossed white lines and the letters ''RR'' were placed over each doorway. Stop signs were also

posted at each doorway, although there was evidence that the employer knew that the drivers customarily failed to stop because of their work load. Manually operated blinker lights were installed to warn of approaching trains but no one was assigned to operate them during the "slack" periods, and they were operated, if at all, by "anybody who happened to come along." A mirror was installed on the wall of the main plant opposite the warehouse doorway after a near accident to another fork lift driver, but there was evidence that the mirror did not afford an adequate view of the tracks. All drivers were furnished copies of safety rules and were repeatedly warned of the danger involved in crossing the tracks.

The commission's award of additional compensation was annulled. This court's decision was based upon the fact that "[t]he evidence and the findings of the commission do not show that the employer had the knowledge of the consequences of its act or omission necessary to make the performance of that act or omission a wilful one." (40 Cal.2d at pp. 663-664.) The majority noted that the employer had attempted to provide safety precautions for the employees, had warned them repeatedly of the hazards involved in crossing the tracks and had taken additional, albeit inadequate, precautions after a similiar accident was narrowly avoided. "There is no evidence that the employer had knowledge of any kind that this remedy was inadequate, nor does the record reveal that there was any reason for it to believe that the circumstances which nearly caused a first accident continued to exist." (*Id.* at p. 665.) Although the employer had not done everything that a prudent employer might have done, its actions were not so unreasonable as to evince a reckless disregard for the safety of its employees. But where the employer knowingly puts his employee in a position of known and obvious danger and takes no precautions to protect his employee, the commission is justified in finding that this constitutes serious and willful misconduct (*Vega Aircraft* v. *Industrial Acc. Com., supra,* 27 Cal.2d 529).

In the instant case the commission was justified in finding, under the facts, that the employers, through their foreman, had ordered the employee into a position of known danger, and then left the area without taking any precautions to protect the employee. The facts show that Tanner ordered Henry, an inexperienced laborer, to perform an obviously dangerous act—pulling rice from the auger with his hands. This was a fact to which the employer (through his

foreman) *had* put his mind. Tanner testified that such an operation was dangerous. He knew that Henry could not be seen from the location where the bankout motor was operated. He knew that Henry could be seriously injured if the motor were started while he was still attempting to unplug the machine. He also knew that there were other men in the field, any one of whom might start the motor. And he knew that if he started the motor he would be unable to see whether anyone was working at the back of the wagon. Despite this knowledge, the foreman, after ordering Henry to remain in a position of known danger, left the scene without taking any action to protect Henry against the possibility that he or someone else might start the engine while Henry was still cleaning out the auger. He did not even warn Henry to stop the tractor motor so that he would hear the noise if someone began cranking the bankout wagon's motor. Certainly this conduct justified the commission in finding that Tanner should have known that Henry was in a position of serious danger, "that he failed to take reasonable action to substantially alleviate the danger, and that in so doing he evinced a reckless disregard for the safety, not only of . . . [Henry] but also of the other employes . . . ." (*Vega Aircraft* v. *Industrial Acc. Com., supra,* 27 Cal.2d 529, 534.)

The serious and willful misconduct consisted of the foreman ordering Henry into a position that Tanner admitted that he knew was dangerous, and which he knew would result in serious injury if someone started the motor. The fact that he later forgot that Henry was there is entirely irrelevant. It is not important that it was the foreman, who, in a moment of forgetfulness, turned on the motor. It would make no legal difference if some fellow employee, in complete ignorance of Henry's presence, had turned on the motor. Stated another way, whether Tanner or some fellow employee turned on the motor, serious and willful misconduct existed. The serious and willful misconduct did not consist of Tanner forgetting that Henry was in a position of danger. The serious and willful misconduct consisted of ordering an employee into a known place of danger, knowing that injury would result if someone started the motor, without taking some precaution to protect against that danger. Under all the circumstances, and under the rules announced in not only the Kaiser case but in Mercer-Fraser, Hawaiian Pineapple and the Vega Aircraft cases, it must be held that the commission was justified in finding that the employers were guilty of serious and willful misconduct.

While there is some language in the referee's report that suggests that the referee gave some weight to the fact that Tanner forgot that Henry was in a place of danger, the commission did not base its decision upon that factor, but based it squarely upon the reasoning in the Kaiser case. As already pointed out, that case was not based on the fact of forgetfulness, but upon the original act of placing the employee in a position of danger without taking precautions for his safety. We must assume that the commission's decision was based upon this theory. ▮▮▮ Findings are, of course, to be liberally construed in favor of the award, and an uncertain finding will be upheld if it can be made certain by a reference to the record. (*Mercer-Fraser Co.* v. *Industrial Acc. Com.*, *supra*, 40 Cal.2d 102, 123; *Vega Aircraft* v. *Industrial Acc. Com.*, *supra*, 27 Cal.2d 529, 535.) The commission held that the rule of the Kaiser case was applicable. The evidence supports that theory.

The award is affirmed.

Gibson, C. J., Traynor, J., White, J., and Dooling, J., concurred.

SCHAUER, J., Dissenting.—The reasoning and conclusions expressed for the District Court of Appeal (when this case was before that court) by Presiding Justice Bray and concurred in by Justices Tobriner and Duniway (as reported in (Cal.App.) 5 Cal.Rptr. 600) in my view typify integrity of the juridical process and benefit clarity of the law. I would adopt that court's opinion and annul the commission's award of punitive damages.

I use the phrase "award of punitive damages" advisedly. As pointed out in the opinion of the District Court of Appeal (p. 607 [7, 8] of 5 Cal.Rptr.), "Although the employee gets the benefit of any sum awarded, it must be remembered that we are not dealing with a question of compensation for an injury (the employee has already received this) but with a penalty placed upon the employer for an act so serious and wilful that the employer may not insure against it. [Ins. Code, § 11661.[1]] Also 'the statute works both ways—hence the importance of correctly defining its terms. . . .' [*Hawaiian Pineapple Co.* v. *Industrial Acc. Com.* (1953), 40

---

[1]Insurance Code, § 11661: "An insurer shall not insure against the liability of the employer for the additional compensation recoverable for serious and wilful misconduct of the employer or his agent."

Cal.2d 656, 664 (225 P.2d 431).] That is, the type of act which would cause the employer to be penalized must likewise be the type of act which would cause the employee to be penalized if performed by him.''

The majority opinion makes out a clear case of negligence—probably gross negligence—but it fails to show ''serious and wilful misconduct'' within the established meaning of that term. Such opinion does not show that a crime was committed by the employer's foreman (i.e., that in his culpable act there was a ''union or joint operation of act and intent, or criminal negligence'' (Pen. Code, § 20)) or that the foreman was guilty of ''oppression, fraud, or malice.'' (See Civ. Code, § 3294, which defines the basis for punitive damages in a civil tort action.) To me it appears illogical—and detrimental to the objectives of the Workmen's Compensation Act—to so construe that act as to impose on employers and, hence, necessarily on employes (see Lab. Code, § 4551[2]; *Mercer-Fraser Co.* v. *Industrial Acc. Com.* (1953), 40 Cal.2d 102, 109 [5, 6] [251 P.2d 955]), the drastic sanctions, respectively, of punitive damages against the employer and penal forfeiture against the employe of one-half ''the compensation otherwise recoverable'' for conduct less culpable than would support such penalties under the law of either crimes or torts.

In *Lambreton* v. *Industrial Acc. Com.* (1956), 46 Cal.2d 498, 504 [3] [297 P.2d 9], we said, ''[I]n proceedings before the Industrial Accident Commission, a claim for normal benefits and a claim for increased benefits by reason of serious and wilful misconduct are *not* sought upon the same general set of facts, nor do they involve merely a difference or change in legal theory. The relief sought is not the same; the legal liability is not the same; and the 'proceedings' to recover the benefits as respectively provided are recognized as being different. (Lab. Code, § 5407.) [4a] Normal benefits automatically follow from an injury within a covered employment relationship, whereas the additional award based on serious and wilful misconduct of the employer is an *additional* award which, although denominated and regarded for administrative purposes as 'increased compensation' is actually of the nature of a penalty, which is imposed . . . only upon proof of the aggravated criminal or quasi-criminal behavior which con-

---

[2]Labor Code, § 4551: "Where the injury is caused by the serious and wilful misconduct of the injured employee, the compensation otherwise recoverable therefor shall be reduced one-half . . .''

stitutes serious and wilful misconduct, and against which the employer cannot purchase insurance.''

Again it should be emphasized that ''While [Lab. Code] section 4553 provides for an additional one-half of the normal compensation where the employer's 'serious and wilful misconduct' causes the injury, section 4551 provides that 'Where the injury is caused by the serious and wilful misconduct of the injured employee, the compensation otherwise recoverable therefor shall be reduced one-half. . . .' The words 'serious and wilful misconduct' must be given the same meaning in each section. (*Parkhurst* v. *Industrial Acc. Com.* (1942), 20 Cal.2d 826, 831 [129 P.2d 113]; *E. Clemens Horst Co.* v. *Industrial Acc. Com.* (1920) . . . 184 Cal. 180, 188 [193 P. 105, 16 A.L.R. 611].) It was suggested in the Mercer-Fraser case that in determining whether an employer's misconduct would justify increasing an award it would be significant to determine first whether that same misconduct would justify reducing an award made to the one responsible for the misconduct were he the injured party.'' (*Hawaiian Pineapple Co.* v. *Industrial Acc. Com.* (1953), *supra,* 40 Cal.2d 656, 664 [11].)

It has been the law of this state for many years that penalties are not favored but must be created by unambiguous language (*Occidental Building & Loan Assn.* v. *Sullivan* (1882), 62 Cal. 394, 398) and that ''every reasonable intendment is indulged to avoid a penalty.'' (*San Diego Lumber Co.* v. *Wooldredge* (1891), 90 Cal. 574, 579 [27 P. 431], quoted and followed in *Brill* v. *De Turk* (1900), 130 Cal. 241, 243 [62 P. 462].) Again in *Thompson* v. *San Francisco Gas etc. Co.* (1912), 20 Cal.App. 142, 144 [128 P. 347], the principle is elaborated: ''Penalties are never favored either by courts of law or equity. 'Every intendment and presumption is against the person seeking to enforce the penalty or forfeiture provided by such a statute.' (*Savings & Loan Society* v. *McKoon* [1898], 120 Cal. 177, [179] [52 P. 305]; *Irvine* v. *McKeon* [1863], 23 Cal. 472 [474-475].)'' See also *City Lincoln-Mercury Co.* v. *Lindsey* (1959), 52 Cal.2d 267, 276 [12] [339 P.2d 851] and *General Motors Accept. Corp.* v. *Kyle* (1960), 54 Cal.2d 101, 111-112 [11] [4 Cal.Rptr. 496, 351 P.2d 768]. The majority opinion transgresses the sound rules above quoted by extending beyond the clear and well established meaning of the statutory language the circumstances in which the Industrial Accident Commission may im-

pose punitive damages against an employer and necessarily, in like circumstances, forfeitures against employes.

Such construction may in this case appear at first glance to operate for the benefit of the injured workman by giving him, in addition to his compensation, the penalty assessed against the employer. But this is a short-sighted view. The definition of conduct requiring imposition of the penalty as enlarged today against the employer—assuming, of course, common honesty and equal fairness in application of the rule—is the definition which from today on must control the forfeiture against employes of one-half ''the compensation otherwise recoverable'' when their conduct is comparable to that of the foreman here. Such judicial increment to the bases for imposition of penalties and forfeitures is not only obnoxious to the general rules above mentioned but is inconsistent with the direction of Labor Code, section 3202, that ''The provisions of . . . this code shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment.''

For all of the reasons above stated I concur in the conclusions of Presiding Justice Bray and Justices Tobriner and Duniway, and would annul the punitive damage award.

McComb, J., concurred.