[Sac. No. 6238. In Bank. Jan. 6, 1953.]

MERCER - FRASER COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and DAWN THALIA SODEN, Respondents.

[Sac. No. 6239. In Bank. Jan. 6, 1953.]

MERCER - FRASER COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and MAUDE MAY EPPING, Respondents.

[Sac. No. 6240. In Bank. Jan. 6, 1953.]

MERCER - FRASER COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and JOHN F. WALSH, Respondents.

[Sac. No. 6241. In Bank. Jan. 6, 1953.]

MERCER - FRASER COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and JAMES A. McNABB, Respondents.

Gardiner Johnson, Roy D. Reese and Samuel C. Shenk for Petitioner.

Edmund J. Thomas, Jr., T. Groezinger, P. H. McCarthy, Jr., F. Nason O'Hara, Herbert S. Johnson and Alfred C. Skaife for Respondents.

SCHAUER, J.—In these four consolidated matters petitioner corporation seeks review of awards, made by the Industrial Accident Commission, of increased benefits assessed against it under the provisions of section 4553 of the Labor Code,[1] upon the theory that it was guilty of serious and wilful misconduct.[2] We have concluded that although we assume the sufficiency of the evidence to support findings which would sustain awards upon the issue of serious and wilful misconduct, petitioner is correct in its contention that the findings made by the commission do not support the awards, in that they disclose that such awards are based upon an erroneous and untenable concept of the law. We conclude further that the individual respondents' objections to the jurisdiction of this court to entertain these proceedings on their merits cannot be sustained, and that the awards should be annulled.

In June, 1948, four employes of petitioner were injured, two of them (Soden and Epping) fatally, when the prefabricated parts of a building being constructed by the employer collapsed and fell while the employes were working thereon. The record shows that the commission made a conclusional finding that the employer was guilty of serious and wilful misconduct and that this conclusion is based on various primary findings, including a finding that the employer's general superintendent knowingly and wilfully failed and neglected to properly and adequately brace and guy the prefabricated parts of the building being erected, "so as to prevent" the fall or collapse thereof during the construction. The record also discloses, as will subsequently be shown in some detail, that the commission was of the view that the peti-

---

[1] Unless otherwise stated, all section citations refer to sections of the Labor Code.

[2] Awards for normal compensation were made in other and prior proceedings before the commission, and are not here involved or before us.

tioner was bound under an absolute duty to preserve the safety of the employes, at least to the extent that it was humanly possible to foresee and guard against danger, and that any failure to maintain such standard of safety, whether negligent or otherwise, constituted serious and wilful misconduct.

Petitioner urges that the awards are unreasonable and arbitrary and are not supported by the findings, that the findings are not supported by the evidence, and more particularly that the commission has by the findings and awards unlawfully imposed upon petitioner a responsibility to insure (i.e., preserve absolutely) the safety of its employees or be subject to the increased assessment under section 4553.

■ It must be recognized at the outset that the statute in question does not make the employer an insurer of safety and that it does not authorize the additional award upon a showing of mere negligence, or even of gross negligence. ■ Under the provisions of section 4553 the awards of increased benefits can be sustained only if the employes were "injured by reason of the *serious and wilful misconduct*" (italics added) of the employer, and where, as here, the employer is a corporation, such misconduct must be "on the part of an executive, managing officer, or general superintendent" of the employer corporation. (See *California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1947), 31 Cal.2d 278, 279 [188 P.2d 32].) ■ Imposition of the increased award upon evidence showing (or a finding of) conduct any less culpable than that specified by the statute would constitute an unlawful taking of the property of one person and an unwarranted giving of it to another. ■ An award of the type here involved, although denominated and regarded for some purposes as "increased compensation," is actually of the nature of a penalty (Campbell, "Workmen's Compensation," § 423, p. 381; *cf. E. Clemens Horst Co.* v. *Industrial Acc. Com.* (1920), 184 Cal. 180, 192 [193 P. 105, 16 A.L.R. 611]), and cannot be insured against (Ins. Code, § 11661[3]). Such an award, therefore, can be sustained only if the evidence establishes and the commission finds, directly or impliedly, every fact essential to its imposition.

Since in interpreting the law (specifically, the meaning of the words "serious and wilful misconduct") we must concern

---

[3]Insurance Code, § 11661: "An insurer shall not insure against the liability of the employer for the additional compensation recoverable for serious and wilful misconduct of the employer or his agent."

ourselves with its impact upon employes as well as upon employers, it should be noted that, with certain statutory exceptions, the Legislature has seen fit to penalize employes as well as employers for "serious and wilful misconduct." "Where the injury is caused by the serious and wilful misconduct of the injured employee, the compensation otherwise recoverable therefor shall be reduced one-half . . ." (§ 4551).

██ It cannot be seriously disputed that the words "serious and wilful misconduct" must be given the same meaning in section 4551 as they have in section 4553. As has been heretofore declared, "There is no difference in principle between the degree of care required of an employer and that exacted from an employee" in determining whether serious and wilful misconduct occurred (see Campbell, "Workmen's Compensation," § 393, p. 363; *E. Clemens Horst Co.* v. *Industrial Acc. Com.* (1920), *supra,* 184 Cal. 180, 188; *Parkhurst* v. *Industrial Acc. Com.* (1942), 20 Cal.2d 826, 831 [129 P.2d 113]). In other words, acts of the employer, to constitute serious and wilful misconduct which would warrant increased compensation must be of no less moment, in the relative circumstances, than the acts of an employe which would warrant reduction of his normal compensation. ██ In determining, then, whether the managing superintendent of petitioner was guilty of serious and wilful misconduct which would justify *increasing* the award for other injured employes we must also consider that such misconduct, if the same accident injured the superintendent, would require *reducing the normal award* to him.

In order that the general principles of the law, which we hereinafter undertake to state with such comprehensiveness as appears practicable, may be clearly understood in their application to this case, it seems desirable to first relate the facts with considerable detail.

The prefabricated wooden structure here involved was one of three units, A, B, and C, being constructed by petitioner for the Hammond Lumber Company. Hammond supplied the materials and hardware and prefabricated the lumber, and petitioner supplied the construction "know-how" and the men for the job. Each unit, when completed, was to be approximately 500 feet long in a north-south direction and 192 feet wide. Units A and B, standing side by side, were up and all of the bracing, except for the roof panels, was in. The accident occurred during the construction of unit C, which was situated to the north of, and adjacent to, unit A,

and was to be attached to the latter unit (i.e., the south end of C was to be attached by trusses to the north end of A) to form one continuous building 1,000 feet in length. C was not commenced as an extension of A; rather, petitioner began the erection of C at its most northerly end, raising and extending columns and trusses in a southerly direction until C reached the junction point with A.

Each unit was erected with 14-inch square timber columns standing vertically on concrete footings. The columns were spaced some 60 feet apart along the length of each unit and 63½ feet apart along the width, thus forming rectangular areas (termed bays) throughout the unit. Prefabricated wooden trusses, 60 feet long (designated as longitudinal or wall trusses), were mounted on top of each pair of columns along the length of the unit to span the space between columns, and similar trusses, some 63½ feet long (designated as transverse or roof trusses), were mounted on top of each pair of columns across the width of the unit.

According to the design of unit C, the framework when completed would have had longitudinal knee braces connecting the several columns with the longitudinal trusses each column supported. Also each column would have had transverse knee braces and transverse sway braces connecting each column to the transverse trusses which it supported. These braces were designed to give the structure support and stability against the pressure of external forces.

The method of erecting the three units appears to have been as follows: An initial bay or square (defined by the four columns on its four corners) was erected, with each of the four columns "guyed" to erection towers and also "[G]uy lines [were put] out, . . . cross lines. . . . Inside and outside. . . . So it was braced in a square. . . . [I]t would be crossed inside, criss-crossed, and also externally outside"; longitudinal and transverse trusses were then set on top of the columns; the initial bay was made the "Anchor block for the rest of the building blocks [or bays]," which were not braced the same as the initial bay; in addition to the guying and bracing of the initial bay, guy lines attached to "deadmen" (objects serving as anchors buried in the ground) were secured to columns along the external sides of the structure.

On the day unit C collapsed all of its columns were up except for two bays to be constructed at the northwest corner, and all trusses were in place except the longitudinal

trusses which were to complete the connection between C and A. Installation of the bracing required by the plans and specifications had been commenced but only one set of four sway braces attached to one column and the two trusses it supported at the north end of C had been completely attached. A crew (including the injured employes Walsh and Epping) working under foreman Hoffman were installing a sway brace at the northern end of C and making roof panels, and another crew (including the employes Soden and McNabb) under foreman Hatten were installing the longitudinal trusses connecting A and C. C collapsed over its entire length and width.

R. B. McIntosh, superintendent of maintenance and construction and chief engineer for Hammond (the company for which petitioner, Mercer-Fraser, was constructing the building), testified that he is an engineer by profession; that the plans and specifications for the buildings were drawn by an architect and let out for bid by contractors, and that petitioner was awarded the contract to build; on the job site and on an unspecified date prior to collapse of C, the witness, in the presence of Ernest Johnson (construction supervisor for Hammond), told McFarlan (petitioner's construction superintendent) that "because of the type of construction I thought the building needed more guy lines at that stage of construction. . . . I believe it was in connection with building 'C,' but the same would apply to all the buildings because the type of construction was the same. . . . [T]he gist of [McFarlan's reply] . . . was that he considered the building stable enough to stand with the guy lines as they were placed. . . . [H]is statement was to the effect that the construction was good heavy construction and that he thought it would stay up as it was being done, I don't think that he specifically mentioned we had enough guy wires, but he figured it was all right the way it was, that was the gist of it"; "guy lines in any construction are a form of temporary brace to hold the construction in place until the braces in the design or whatever might be designed into the building to hold it stable are in place"; on the day of the accident, just before the building collapsed about 1 p.m., there "was a pretty stiff wind, but nothing to evoke any great comment as I remember, . . . from the northwest"; it is "good construction practice to follow along in back of the erection of columns and brace them as you're going along . . . [including] not only guy lines but sway and transverse

braces . . . [P]articularly on this building I would say it was important . . . [T]he particular type of connection of the trusses and columns was somewhat unusual"; my "conclusion was that . . . the collapse of the building was caused by . . . a combination of the wind and the inadequacy of bracing"; at the time of the hearing at which he was testifying (some two years after the accident) the buildings had been completed "and in the same manner as they were being built, except . . . there was some additional [steel] bracing added to the plans and incorporated in the buildings after the [accident] . . . that bracing was in the walls and was not included in the work that Mercer-Fraser was to do . . . [and] was not planned until after the collapse of the building."

Ernest Johnson, construction supervisor and "expediter of material" for Hammond, testified that he is not an engineer by profession and had had no prior experience "in heavy construction of this particular type . . . before the commencement of" unit A; his job in connection with the construction here involved was to look after Hammond's interests and "see that the building was constructed as per drawings and specifications"; he had no authority to instruct petitioner's employes "as to the method they should use to erect" the buildings, "I could just offer my suggestions"; the method of construction used was McFarlan's (petitioner's superintendent) "own idea of how it should be done"; the manner of erection and when the bracing was to be installed were left to petitioner's discretion and were not shown on the plans and specifications. About "a week or ten days before the accident" the witness and his supervisor, McIntosh, discussed the guy lines and the bracing on the three units with McFarlan; "we figured there should be more guy lines . . . McFarlan . . . thought there was enough . . . [W]e didn't think there was enough bracing on it, that it may collapse"; following this discussion nothing was "done to change the guy line situation" although the witness did not know how many guy lines were on unit C on the day it collapsed (after the accident he saw some at the north end but recalled none in the center of the unit); petitioner's employes started to put more guy lines on units A and B "shortly after" C collapsed; the witness recalled no "objectionable features concerning the construction" other than the discussion as to the guy lines; units A and C were "almost identical" in construction and plan, the only difference was that C was "slight-

ly higher'' than A; A and B did not collapse and were still standing at the time of the hearing.

McNabb, one of the injured workmen, who was a carpenter and a member of the ''erection crew'' under foreman Hatten, testified that on the day of the accident, he and Soden (who died from injuries received in the accident) were ''working on top of'' unit C and were engaged in connecting units A and C; no one else was ''on the top''; before noon they had installed one of the trusses connecting the two units; in so doing they had discovered that the gap between A and C ''was two and a half inches longer than the truss'' and ''the whole building, the 500-foot from the north had to be pulled two and a half inches over to connect it''; the two workmen ''had put a chain block at the top of the truss'' on C, and ''the post at the bottom'' of C and ''made this two and a half inches pull to allow us to get our truss in''; after lunch Mc-Nabb and Soden started to install another truss connecting the next succeeding columns of A and C, but found the gap this time was an inch and a half too short; again using a chain block the two workmen pulled unit C ''back an inch and a half to allow this truss to go in''; ''about five to ten minutes'' later the building collapsed. McNabb further stated that on the evening before the collapse he and Soden had ''come down off the roof [of C] that evening, and at that particular time, there was nothing to hold it except just a box in the air, this thing we could feel it move, and so we . . . told him [foreman Hatten] at that time, in fact I told Mr. Hatten the next day if something wasn't done I was going to stop, I wasn't going to work, and so he says, 'I think we can make her and get her hooked up' ''; later the same evening McNabb told superintendent McFarlan that ''If there ain't something done to this building, it won't be here much longer,'' and McFarlan said, ''Oh I think it's very good, in very good condition, it's boxed up good and it's wide and the spans are long, I think it will stand.''

Harold McFarlan, who had been petitioner's construction superintendent for 10 years, was the ''general superintendent'' referred to in the commission's findings as being guilty of serious and wilful misconduct. His competence and good faith are unquestioned in the record unless we can infer that they are negatived by the commission's conclusional finding of serious and wilful misconduct. For reasons hereinafter developed we think that such an inference is not reasonable or tenable and that the commission does not, itself, draw it.

Mr. McFarlan testified that he had been doing heavy construction work for some 40 years; that in this construction of unit C the blueprints were followed, as well as good construction practice and Safety Orders issued by the State of California; that some 10 days before the accident there was a "high wind" and "Mr. McIntosh got worried about the building, and so did I, and" the witness thereupon made "preparations to overcome the deficiency in the bracing"; "we certainly didn't knowingly erect anything hazardous, we didn't ask men to work in places if we thought it was dangerous, and I certainly wouldn't ask anybody to work under that building if I thought it was going to fall down . . . I certainly wouldn't have had my own son and all the other men working underneath that building"; on the day before the accident he was told by the engineer and the oiler on a crane that some guy lines were removed from unit C in order to permit moving the crane, and he didn't know whether they were replaced; following the collapse of C additional bracing was installed in units A and B; the "internal diagonal 'X' bracing" was not placed on unit C "identical to what it was on buildings" A and B for the reason that Hammond "requested that we keep the passageway open through that building so that the fire-fighting equipment could get in there in case of a fire," but other guy lines placed on C were "adequate to serve the purpose that the internal diagonal 'X' bracing would serve."

Harold B. Hamill, a consulting structural engineer, testified that in his opinion unit C collapsed "because it didn't have proper . . . braces to resist forces from the west" and that he was referring to any type of brace "the contractor might have wanted to put on which would have resisted forces from the west. They could have been guy lines from the outside . . . or the inside . . . [T]here were none. It wouldn't have fallen if there had been any."

In support of the award respondents rely upon the familiar rules (which petitioner does not challenge) that where the evidence is in substantial conflict or is susceptible of conflicting inferences the finding of the commission, whether for or against the applicant, is final and it is our duty to uphold such finding (*California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1946), 27 Cal.2d 536, 541-542 [165 P.2d 669]), and that questions as to the weight of the evidence and the credibility of the witnesses are for the commission and if there is any evidence, whether direct or by reasonable inference, which will support the commission's finding, the re-

viewing court has no power to disturb it. (*Nielsen* v. *Industrial Acc. Com.* (1934), 220 Cal. 118, 122 [29 P.2d 852, 30 P.2d 995].)

Respondents urge that the evidence is susceptible of the inference that superintendent McFarlan was guilty of serious and wilful misconduct as more particularly specified in the findings, hereinafter quoted or epitomized in some detail, and in this connection cite various general provisions of the Labor Code requiring the employer to maintain safe working conditions. (See §§ 6310, 6311, 6400-6406.)[4] Petitioner contends that the evidence would support a finding of nothing more culpable than a mistake in judgment or, at the most, of negligence, by McFarlan on the critical question of adequacy of the guy lines and the bracing in unit C, and that by a process of "hindsight" or "reverse reasoning" the commission has imposed upon petitioner the duty to absolutely preserve the safety of its employes. The evidence does, of course, support the conclusion that the collapse resulted from inadequate guying and bracing. To decide intelligently the controlling issues in these cases we must first understand clearly the essentials for an award.

Whether in any given case serious and wilful misconduct is shown, inherently presents questions of both fact and law. Insofar as the issues may relate to the credibility of witnesses, the persuasiveness or weight of the evidence and the resolving of conflicting inferences, the questions are of fact. But as to what minimum factual elements must be proven in order to constitute serious and wilful misconduct, and the sufficiency of the evidence to that end, the questions are of law.

The courts of this state have frequently had occasion to discuss and to define the terms "negligence," "wilful misconduct," and "serious and wilful misconduct," and to emphasize the basic and substantial differences between negligence and wilful misconduct. For guidance in stating comprehensively the elements which must control the Industrial Accident Commission and the courts in applying the pertinent statutes

---

[4]Section 6310: " 'Safe' and 'safety' as applied to an employment or a place of employment mean such freedom from danger to the life or safety of employees as the nature of the employment reasonably permits."

Section 6311: " 'Safety device' and 'safeguard' shall be given a broad interpretation so as to include any practicable method of mitigating or preventing a specific danger."

to the facts of particular cases we have reviewed the decisions in all related types of cases which have come to our attention. We bear in mind that the discussions and definitions in the respective cases ordinarily relate primarily to the term or terms as used in the particular statute with which the court was then concerned and that, for example, it is not necessarily true that "wilful misconduct" under the automobile guest statute (Veh. Code, § 403) has been unvaryingly regarded as being precisely the same as "serious and wilful misconduct" under the Labor Code (§ 4553.) But the discussions and definitions evolved in cases considering these several statutes and related statutes or common law principles are helpful in determining what the Legislature must have meant in phrasing the statute in question.

Thus, in *Donnelly* v. *Southern Pac. Co.* (1941), 18 Cal. 2d 863 [118 P.2d 465], this court in defining what is meant by "willful and wanton negligence" as that phrase has been used by the federal courts, declared (pp. 869-870) :

"Negligence is an unintentional tort, a failure to exercise the degree of care in a given situation that a reasonable man under similar circumstances would exercise to protect others from harm. (Rest. Torts, secs. 282, 283, 284; Prosser, Torts, secs. 30 et seq.) A negligent person has no desire to cause the harm that results from his carelessness, (Rest. Torts, sec. 282(c)), and he must be distinguished from a person guilty of willful misconduct, such as assault and battery, who intends to cause harm. (Prosser, Torts, p. 261.) Willfulness and negligence are contradictory terms. . . . [Citations.] If conduct is negligent, it is not willful; if it is willful, it is not negligent. It is frequently difficult, however, to characterize conduct as willful or negligent. A tort having some of the characteristics of both negligence and willfulness occurs when a person with no intent to cause harm intentionally performs an act so unreasonable and dangerous that he knows, or should know, it is highly probable that harm will result. (Rest. Torts, sec. 500 et seq.; Prosser, Torts, pp. 260, 261.) Such a tort has been labeled 'willful negligence,' 'wanton and willful negligence,' 'wanton and willful misconduct,' and even 'gross negligence.' It is most accurately designated as wanton and reckless misconduct. It involves no intention, as does willful misconduct, to do harm, and it differs from negligence in that it does involve an intention to perform an act that the actor knows, or should know, will very probably cause harm. . . . [Citations.] Wanton and reckless misconduct is

more closely akin to willful misconduct than to negligence, and it has most of the legal consequences of willful misconduct.''

And as appears from *Porter* v. *Hofman* (1938), 12 Cal.2d 445, 447-448 [85 P.2d 447] (a case involving the term ''wilful misconduct'' as used in the so-called guest statute, Veh. Code, § 403), and cases there cited, this court has approved the following definitions: ''Wilful misconduct . . . necessarily involves deliberate, intentional, *or wanton* conduct in doing or omitting to perform acts, with knowledge or appreciation of the fact, on the part of the culpable person, *that danger is likely to result therefrom.''*

''Wilfulness necessarily involves the performance of a deliberate or intentional act or omission regardless of the consequences.''

'' 'Wilful misconduct' means something different from and more than negligence, however gross. The term 'serious and wilful misconduct' is described . . . as being something 'much more than mere negligence, or even gross or culpable negligence' and as involving 'conduct of a *quasi* criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury, or with a wanton and reckless disregard of its possible consequences' . . . The mere failure to perform a statutory duty is not, alone, wilful misconduct. It amounts only to simple negligence. To constitute 'wilful misconduct' there must be actual knowledge, or that which in the law is esteemed to be the equivalent of actual knowledge, of the peril to be apprehended from the failure to act, coupled with a conscious failure to act to the end of averting injury. . . .'' Substantially the same principles are stated in *Helme* v. *Great Western Milling Co.* (1919), 43 Cal.App. 416, 421 [185 P. 510]; in *James I. Barnes etc. Co.* v. *Industrial Acc. Com.* (1944), 65 Cal.App.2d 249, 254 [150 P.2d 527]; in *Parsons* v. *Fuller* (1937), 8 Cal.2d 463, 468 [66 P.2d 430]; and in *Cope* v. *Davison* (1947), 30 Cal.2d 193, 198 [180 P.2d 873, 171 A.L.R. 965]; see, also, *North Pac. S. S. Co.* v. *Industrial Acc. Com.* (1917), 174 Cal. 500, 502 [163 P. 910]; *Ethel D. Co.* v. *Industrial Acc. Com.* (1934), 219 Cal. 699, 704 [28 P.2d 919]; *Hargrave* v. *Industrial Acc. Com.* (1940), 5 Cal. Comp. Cases 129.

In *Meek* v. *Fowler* (1935), 3 Cal.2d 420, 425-426 [45 P.2d 194] (a case also involving the so-called guest statute, and quoting in part from *Howard* v. *Howard* (1933), 132 Cal.

App. 124, 128 [22 P.2d 279] [guest statute]; see, also, *Weber* v. *Pinyan* (1937), 9 Cal.2d 226, 230-235 [70 P.2d 183, 112 A.L.R. 407] [guest statute]), the pertinent principles are discussed as follows: "While the line between gross negligence and wilful misconduct may not always be easy to draw, a distinction appears . . . in that gross negligence is merely such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, while wilful misconduct involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences. It seems clear that in excluding all forms of negligence as a basis for recovery in a guest case, the legislature must have intended that to permit a recovery in such a case the thing done by a defendant must amount to misconduct as distinguished from negligence and that this misconduct must be wilful. While the word 'wilful' implies an intent, the intention referred to relates to the misconduct and not merely to the fact that some act was intentionally done. In ordinary negligence, and presumably more so in gross negligence, the element of intent to do the act is present and any negligence might be termed misconduct. But wilful misconduct as used in this statute means neither the sort of misconduct involved in any negligence nor the mere intent to do the act which constitutes negligence. Wilful misconduct implies at least the intentional doing of something either with a knowledge that serious injury is a *probable* (as distinguished from a possible) result, or the intentional doing of an act with a wanton and reckless disregard of its *possible* result.

"Such intent and knowledge of probable injury may not be inferred from the facts in every case showing an act or omission constituting negligence for, if this were true, any set of facts sufficient to sustain a finding of negligence would likewise be sufficient to sustain a finding of wilful misconduct. As has been repeatedly declared, ' "wilful misconduct" means something more than negligence—more, even, than gross negligence.' [Citations.]" ██ Manifestly, "serious *and* wilful misconduct" cannot be established by showing acts any less culpable, any less deliberate, or any less knowing or intentional, than is required to prove wilful misconduct.

The situation here, which involved technical matters and skilled, expert judgment, is quite obviously distinguishable from the cases presented in *Bethlehem Steel Co.* v. *Industrial*

*Acc. Com.* (1944), 23 Cal.2d 659 [145 P.2d 583], *Parkhurst* v. *Industrial Acc. Com.* (1942), *supra,* 20 Cal.2d 826, and *Blue Diamond Plaster Co.* v. *Industrial Acc. Com.* (1922), 188 Cal. 403 [205 P. 678], in each of which it was found that the employer had violated an express statute or safety order framed to protect the employes. (*Cf. Simmons Co.* v. *Industrial Acc. Com.* (1945), 70 Cal.App.2d 664, 670 [161 P.2d 702].) Thus, in the Bethlehem Steel case, the employer violated a specific safety order of the Industrial Accident Commission requiring that loads being transported by trucks ''shall be secured against displacement''; in the Parkhurst case the violation was of statutes and of specific orders of health authorities relating to the purity of, and the methods of supplying, drinking water to the employes; and in the Blue Diamond case both ''general safety orders of the commission and . . . its express and repeated directions . . . with relation to the safeguarding of the belts and pulleys of the plant'' were violated. By contrast, in the cases now before us no such specific statute or safety order is involved, but only expert judgment as to the extent of the guying and bracing needed in the course of the particular construction job here involved.

Some attempt has been made to isolate statements from some of the above cited cases which might appear to support the view that any negligent act or omission could be held to constitute serious and wilful misconduct. By way of examples, the following sentences from the indicated cases may be quoted: ''The long continued maintenance of these [dangerous] conditions was properly found to constitute serious misconduct'' (*California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1947), 31 Cal.2d 270, 273 [188 P.2d 27]); ''It has been held . . . that an employer's mistake in judgment does not relieve him from liability for serious and wilful misconduct'' (*Parkhurst* v. *Industrial Acc. Com.* (1942), *supra,* 20 Cal.2d 826, 829-830, 831); ''The mere fact the employer did not believe the condition was dangerous does not relieve him from liability'' (*Bethlehem Steel Co.* v. *Industrial Acc. Com.* (1944), *supra,* 23 Cal.2d 659, 665).

The above quoted statements as used in their contexts and applied respectively to the cases there under discussion correctly enunciate pertinent principles of law or propositions of fact. But those statements cannot fairly be isolated and understood to support the proposition that conduct which both courts and legislative bodies have traditionally defined

and considered to be mere negligence, however gross, may be held by the Industrial Accident Commission to be serious and wilful misconduct under the terms of workmen's compensation statutes. ▐ Rather, the true rule is that serious and wilful misconduct is basically the antithesis of negligence, and that the two types of behavior are mutually exclusive; an act which is merely negligent and consequently devoid of either an intention to do harm or of knowledge or appreciation of the fact that danger is likely to result therefrom cannot at the same time constitute wilful misconduct; conversely an act deliberately done for the express purpose of injuring another, or intentionally performed either with knowledge that serious injury is a probable result or with a positive, active, wanton, reckless and absolute disregard of its possibly damaging consequences, cannot properly be classed as the less culpable conduct which is termed negligence. ▐ It follows that a finding of serious and wilful misconduct cannot be sustained upon proof of mere negligence of any degree.

For the purposes of this opinion we assume without holding that the evidence as a matter of law is not insufficient to support a finding that the employers' superintendent, McFarlan, was guilty of serious and wilful misconduct in deliberately, knowingly, and intentionally failing to sufficiently brace and guy unit C so that it would not have collapsed during the course of construction. As shown above, there is testimony that he was warned on at least two or three different occasions that in the opinions of others[5] the building needed additional bracing and was unstable and ''won't be here much longer . . . if something wasn't done''; that it is good construction practice to brace the columns as they are erected, including both permanent bracing (which had not yet been installed when C collapsed) and temporary guying, and that such bracing ''particularly on this building . . . was important''; that some 10 days prior to the collapse McFarlan himself became worried and made ''preparations to overcome the deficiency in the bracing'' (the nature of such preparations and whether they were actually carried to execution, or whether McFarlan deliberately and wantonly refrained from carrying them into execution, does not directly appear although the very fact that he was worried

---

[5] We intend no implication as to the weight, if any, which should be accorded these opinions, or as to the qualification as experts of the persons expressing them.

would seem to negative, rather than affirm, either an intent to harm or a wanton, positive and absolute disregard of possible harm); that on the day before the collapse McFarlan was aware that guy lines had been removed to permit moving a crane, and he did not know whether they had been replaced; and that the wind, on the day of the collapse, was "pretty stiff." We particularly assume, for purposes of the opinion, but without so holding, that such testimony admits of the essential inference (we intend no implication that it is persuasive to that end or that as triers of fact we should so find) that McFarlan was further aware that unit C was so unstable as to constitute an imminent and probable threat to the safety of the men working on it, and that his failure to properly brace and guy the building went beyond mere negligence and constituted an intentional omission of a criminal or quasi-criminal nature done either with knowledge that serious or fatal injury was a probable result or with a positive, active, absolute, reckless and wanton disregard for the safety of the workmen.

An award based on such a finding would be within the law. Petitioner would not thereby be required to guarantee or preserve absolutely the safety of its employes, or even be free from negligence, as an alternative to suffering the additional assessment provided for by the terms of section 4553; it would merely have to refrain from such deliberate, knowing and intentional failure to take safety precautions, whereby its employes were intentionally subjected to known, serious, unnecessary and unreasonable hazards, as the Industrial Accident Commission, we are assuming, could have inferred as above suggested. But petitioner's contention that the commission did not make the subject awards on any such view of either the facts or the law and that the findings on the issue of serious and wilful misconduct do not in truth resolve the crucial issue and, hence, are inadequate and fail to support the awards, presents a quite different question.

In each of these cases the commission's findings on the issue of serious and wilful misconduct are that (italics added throughout) "The employee was injured, in said employment, by reason of the serious and wilful misconduct of the employer *in the manner more particularly as follows*: . . . That at, and immediately prior to, the time of injury . . . the employer through its general superintendent, did knowingly and wilfully fail and neglect":

(a) To "furnish employment, and a place of employment, which was safe for the work . . ." (As is shown subsequently, it appears that the commission in making this finding was of the view that the mere happening of the accident, coupled with a mistake in judgment on the part of petitioner's superintendent, supports the finding and warrants the conclusion of serious and wilful misconduct on the part of the superintendent.)

(b) To "furnish and use proper, sufficient and adequate safety devices and safeguards; to wit: the necessary and required securing, bracing, and guying of the pre-fabricated parts of a building, then being erected, *so as to prevent* the fall or collapse thereof during the construction *and thereby render* such employment, and construction, and place of employment, and construction, *safe for the work* . . ." (This finding seems to impute an absolute duty "to prevent the fall or collapse . . . during the construction," and it suggests the view that only by absolute prevention of collapse can the employer avoid being held guilty of serious and wilful misconduct for failing to provide a safe place of employment.)

(c) To "adopt and use those practices, means, methods, and operations, in securing, bracing and guying the pre-fabricated parts of a building then being erected, *so as to prevent* the fall or collapse during the construction thereof *and thereby render* such employment, and construction, and place of employment, and construction, *safe for the work* . . ." (Again, as in (b), this finding seems to impute an absolute duty "to prevent the fall or collapse during the construction," and a like absolute standard in respect to the safety of the work.)

(d) To "do those things which a prudent employer would have done, had it turned its mind to the fact, and which were required to secure, brace, and guy the pre-fabricated parts of a building, to protect the life, limb and safety of the employees . . ." (This finding obviously shows the view that negligence and serious and wilful misconduct are synonymous.)

(e) To "use and to exercise that degree of prudence, foresight and caution which, under the circumstances, a prudent employer would then and there have used and exercised, had it turned its mind to the fact, in requiring, permitting and directing its employee . . . to go, work, and be, in employment, and construction, and place of employment, and

construction, that was then and there unsafe." (This finding like (d), imputes no more than negligence as a basis for the conclusion of serious and wilful misconduct.)

(f) To "use and to exercise that degree of prudence and caution which, under the circumstances, a prudent employer would then and there have used and exercised, had it turned its mind to the fact, in requiring and directing its employees, . . . to work upon, or in connection with, the erection of prefabricated parts of a building, without *first insuring* and securing proper, adequate, and *necessary* bracing and guying *so as to prevent the collapse* of said structure during, and in the course of, said erection and construction." (This finding not only defines negligence to constitute serious and wilful misconduct (as do (d) and (e)) but also appears to construe as serious and wilful misconduct any failure to *insure* absolute safety of the structure.)

(g) To "comply with the requirements of Labor Code, Sections 6400, 6401, 6402, and 6403, and each of them, neglecting, and omitting, to provide, secure, furnish and maintain, in place, and at the place of employment, necessary and adequate bracing and guying of the pre-fabricated parts of a building then being erected *so as to prevent* its fall or collapse during, and in the course of, said construction."[6] (This finding seems to presuppose that any failure for any reason to install and maintain such guying and bracing as would absolutely "prevent" the fall or collapse of the structure, would amount to a violation of the listed sections and would constitute serious and wilful misconduct.)

The primary rule of construing findings is to interpret them liberally in favor of sustaining the award, and even if a finding, by itself, is inadequate for uncertainty it

---

[6]In contrast to the commission's findings and conclusions, the report of the referee who conducted the hearings is as follows:

"If anybody would be charged with serious and wilful misconduct, it would be on account of Mr. McFarlan's actions in not seeing to it that better guy lines or more of them were put up. Having watched him carefully at the hearing and considered his testimony in connection with the entire record, I do not believe that anybody would question his good faith or that he acted with full intentions of looking out for the safety of his crew. The fact that he misjudged the stresses and strains on the adequacy of the guy lines, if admitted, is not sufficient to charge the employer with serious and wilful misconduct."

The referee then correctly states the law governing the conclusion which should be drawn from the facts as he viewed them and concludes with the statement that: "The evidence is insufficient to establish that the injury was caused by the serious and wilful misconduct of the employer."

will still be upheld if it can be made certain by reference to the record. This court consistently has been liberal in giving effect to such rule (see *Vega Aircraft* v. *Industrial Acc. Com.* (1946), 27 Cal.2d 529, 535-536 [165 P.2d 665]; *California Shipbuilding Corp.* v. *Industrial Acc. Com.* (1947), *supra*, 31 Cal.2d 278, 279; *Ethel D. Co.* v. *Industrial Acc. Com.* (1934), *supra*, 219 Cal. 699, 708) and it does not now recede from it. But here the problem is not answered by that rule. Basic justice and common honesty require that the commission and this court be fair to both the employe and the employer. The factual elements which, by the statutory requirement, must be found to exist before an award for serious and wilful misconduct can be sustained are hereinabove declared. The critical question here is: On the whole record can we fairly hold that the commission has found the essential facts to exist? Or, does it appear, rather, that to facts not meeting the legal minimums the commission has applied a standard stricter than that authorized by the Legislature?

After most careful scrutiny of the entire record we conclude that the findings here lead to perplexity which cannot be cured by reference to the record and that on any reasonable construction such findings do not fairly support the awards. ■ Although, as indicated above, it is not required that findings be specific and detailed it is essential that they be sufficient in form and substance so that by reading them and referring to the record the parties can tell and this court can tell with reasonable certainty not only the theory upon which the commission has arrived at its ultimate finding and conclusion but that the commission has in truth found those facts which as a matter of law are essential to sustain its award.

■ It is obvious, as indicated above, that certain of the specifications of "fact" contained in the findings are wholly insufficient, in that they include matters which on any view whatsoever are significant of nothing more culpable than negligence, as for example, in paragraph (e) of the quoted findings (see, also, paragraphs (f) and (d)), that the employer, through its general superintendent, failed and neglected to "exercise that degree of prudence, foresight and caution which, under the circumstances, a prudent employer would then and there have" exercised, and so was guilty of serious and wilful misconduct. Such statements concerning what a "prudent employer" would have done

"had it turned its mind to the fact" obviously do not establish serious and wilful misconduct, which, as has been shown, requires an act or omission to which the employer *has* "turned its mind." Rather, as also above suggested, such statements indicate that the commission has held acts and omissions amounting to no more than negligence, to constitute serious and wilful misconduct. Yet, as previously shown, negligence and wilful misconduct are inherently incompatible. The quoted findings of fact, disregarding the ultimate conclusion of serious and wilful misconduct, do not in any respect determine that the employer here, through its general superintendent, was guilty of more than negligence. Such findings do not with any reasonable certainty determine any facts from which this court can conclude that the petitioner was guilty of serious and wilful misconduct or that, in truth, the commission itself has found facts which warrant such ulitimate conclusion.

The findings made do not determine that the general superintendent had knowledge that if he failed to add further guying and bracing a probable result would be the collapse of the building, nor can this court determine that the commission found as a fact that such superintendent did in truth know or believe that the guying and bracing was insufficient and that a possible result would be the collapse and the serious injury of employes and with that knowledge proceeded with reckless, absolute, positive and wanton disregard of the consequences. Rather, the commission's findings, in paragraphs (d), (e), and (f), on the issue of serious and wilful misconduct demonstrate that the commission has regarded as such serious and wilful misconduct acts and omissions which as a matter of law do not constitute such misconduct, but merely evidence negligence, ▮▮▮ ▮▮▮ ▮▮▮ and as to findings (a), (b), (c), and (g) it appears that the commission has gone even farther than to hold that negligence is serious and wilful misconduct; it seems to have held petitioner to the standard of an insurer.

▮▮▮ Even if it can be said that the findings, or any of them, are ambiguous, and that their language might admit of an interpretation which would sustain the awards upon the legal standards which we have enunciated, we are satisfied that the record here precludes interpretation to that end. Such an ambiguity cannot here fairly be resolved in favor of sustaining the awards because reference to the record and to the commission's formally declared position (its own lan-

guage is hereinafter quoted) seems to demonstrate that the commisson did not in truth find, and does not believe, that all the essentials of wilful and serious misconduct have been proven.

The commission argues that the findings establish serious and wilful misconduct since they state the ultimate conclusion of such misconduct. However, such findings do not specify any facts from which this court can conclude that the basic and essential factual elements, which it is hereinbefore shown are necessary to support the ultimate conclusion of serious and wilful misconduct, were found to exist. Instead, such findings indicate that, as urged by petitioner, the commission was holding petitioner to the standard of an insurer or guarantor of the safety of its employes, rather than applying to the issue of serious and wilful misconduct the legally essential elements which we have specified in detail hereinabove. Thus, in the quoted paragraphs (as more specifically identified above), the words employed by the commission indicate the view that petitioner had an *absolute,* or substantially an absolute, duty and responsibility to make and keep the employment conditions safe against all hazards and to absolutely *prevent* (at least, as hereinafter noted from the argument of the commission, ''In the absence of circumstances which *could* not be foreseen,'' as, for example, an act of God) the collapse of the building here involved, and that any failure to meet that standard, whether due to negligence or otherwise, constituted serious and wilful misconduct. Furthermore, the argument made by the commission itself in its answers to the petitions for the writ conclusively establishes that in fairness to the petitioner this court cannot interpret the conclusional findings as being an actual determination of the essential facts. For example, it is declared in such answers that ''An employer's failure to comply with the requirements of Labor Code, Sections 6400 through 6403 [dealing with an employer's duty to maintain safe working conditions], constitutes serious and wilful misconduct . . . In the absence of extraordinary circumstances which *could* not [apparently meaning in the exercise of the highest degree of care and capability] be foreseen, petitioner was under a duty to employ methods and practices in the erection of the building to *insure* that it would not collapse from the pressure of forces to which it *might* be subjected during the construction period. Petitioner's *failure to take adequate precautions* against the dangers inherent in the erection of the structure

*clearly constitutes serious and wilful misconduct . . .* McFarlan's failure to provide additional bracing was predicated *on his belief that his method of construction and the guying provided was adequate to sustain the structure.*" (Italics added.)

It is manifest from what has been said that if McFarlan in good faith believed (and the commission says he did believe) that the method of construction being employed was sound and sufficient for the safety of all concerned then he was guilty of no more than a mistake in judgment. His mistake in judgment on a technical matter of construction practice is his only "misconduct." In the light of these circumstances and the commission's statement, it seems unthinkable that the commission actually intended to hold, or has held, that McFarlan was guilty of serious and wilful misconduct within the true meaning of that term as defined hereinabove; a meaning, as already pointed out, which would require that if *he* had been injured in the building collapse, the normal award to him would have to be reduced. There is no suggestion that McFarlan was incompetent or inexperienced or that his employer (the petitioner) was itself guilty of misconduct in employing McFarlan for the job at hand. Under the circumstances here appearing, annulment of the awards is compelled.

As previously indicated, in each of the four cases the individual respondent has filed a "Special Appearance in Answer to" the petition for the writ and for hearing in this court, in which it is urged that the court is without jurisdiction to consider such petition by reason of the failure of the petitioner to serve a copy of the petition for the writ upon the individual respondent either prior to filing such petition or within the 30-day period specified by section 5950[7] during which the petition may be filed. On the date (April 13, 1951) of filing of the petitions for review the Rules on Appeal provided, in rule 57, that "(a) A petition to review an order or award of the Industrial Accident Commission shall be accompanied by proof of service of 2 copies thereof on the In-

[7]Section 5950, at the times here involved, provided: "Within thirty days after the petition for a rehearing is denied, or, if the petition is granted, within thirty days after the rendition of the decision on the rehearing, any person affected thereby may apply to the supreme court or to the district court of appeal of the appellate district in which he resides, for a writ of review, for the purpose of inquiring into and determining the lawfulness of the original order, decision, or award, or of the order, decision, or award on rehearing."

dustrial Accident Commission . . .," and petitioner complied with this rule. A copy of the petition was not, however, served upon the individual respondents or their attorneys until July 20, 1951, and the respondents contend that this failure to comply earlier with the provisions of section 5954[8] precludes our consideration of the petition.

Counsel for petitioner state that the delay in serving respondents' attorneys resulted from their complete reliance upon the Rules on Appeal, and that they inadvertently overlooked the service provisions of section 5954 until after the filing of the "Special Appearance" of each individual respondent.[9] We are not disposed, however, to accept the view that such service provisions can properly be interpreted as excluding jurisdiction under the circumstances shown here. It is to be noted that no time limitations appear in section 5954. In section 5905 the Legislature has directed that a copy of a petition to the commission for reconsideration ("rehearing" prior to 1951 amendment) of an award be served "forthwith" (apparently *after* filing, see §§ 5903, 5904) upon all adverse parties, and if a definite time limit was intended to apply to service of a copy of a petition for a writ of review it could easily have been included in section 5954.

Respondents rely upon statements that "The right to be present at any hearing necessarily includes the right to have notice of such hearing in time to attend" (*Carstens* v. *Pillsbury* (1916), 172 Cal. 572, 577 [158 P. 218]), and that "The real adverse party in interest [in a certiorari proceeding] . . . is the one in whose favor the act complained of has been done" (*Lee* v. *Small Claims Court* (1939), 34 Cal.App.2d 1, 5 [92 P.2d 937]), and also upon the holding in *Lyydikainen* v. *Industrial Acc. Com.* (1939), 36 Cal.App.2d 298 [97 P.2d 993], annulling an order of the commission where failure to

---

[8]Section 5954 provides: "The provisions of the Code of Civil Procedure relating to writs of review shall, so far as applicable, apply to proceedings in the courts under the provisions of this article [the article concerning judicial review of commission awards]. A copy of every pleading filed pursuant to the terms of this article shall be served on the commission and upon every party who entered an appearance in the action before the Industrial Accident Commission and whose interest therein is adverse to the party filing such pleading."

[9]Rule 57, Rules on Appeal (as amended effective November 13, 1951) now provides "(a) A petition to review an order or award of the Industrial Accident Commission shall be accompanied by proof of service of 2 copies thereof on the Industrial Accident Commission and one copy upon each party who entered an appearance in the action before the Industrial Accident Commission and whose interest therein is adverse to the party filing the petition. . . ."

comply with statutory provisions for service of a petition for an order terminating liability resulted in an award terminating compensation payments to an injured employe without an opportunity to the employe to be heard. In the present cases, however, the individual respondents have not been denied notice or opportunity to be heard and to file answers to the petitions for writs of review; on the contrary they admit being served on June 16, 1951, with copies of the answers (on the merits) filed by the commission to the petitions for the writ and on July 20, 1951, with copies of the petitions for the writ. Moreover, as observed by the court in *Peter* v. *Board of Supervisors* (1947), 78 Cal.App. 2d 515, 521 [178 P.2d 73], "The requirements as to service when the petition [for the issuance of any prerogative writ, including certiorari] is filed, in section 1107 of the Code of Civil Procedure, would seem to be more directory than mandatory as the court may act on the petition without any service if it decides to do so. Under these circumstances it would seem that service might be made after the petition is filed if the court should decline to proceed in the matter without service. The provisions as to service and points and authorities in opposition to the issuance of a writ under the prayer of a petition would seem to be more for the benefit of the court than for the advantage of the parties." (See, also, Code Civ. Proc., § 1069.) We believe the same observation is appropriate with reference to the service provisions of section 5954 of the Labor Code, and hold respondents' contentions on this point to be without merit.

For the reasons above stated, the subject awards are annulled.

Gibson, C. J., Edmonds, J., Traynor, J., Spence, J., and Wood (Parker), J. pro tem., concurred.

CARTER, J.—I dissent. The majority opinion in this case is a definite departure from what has been considered the settled law of this state in industrial accident cases, namely, that where specific findings of fact are supported by substantial evidence, an award based thereon will be affirmed. Here the commission found, on evidence assumed by the majority to be sufficient to support such findings, that petitioner knowingly and wilfully failed:

(a) To furnish employment, and a place of employment, which was safe for the work.

(b) To furnish and use proper, sufficient and adequate safety devices and safeguards; to wit: the necessary and required securing, bracing, and guying of the prefabricated parts of a building, then being erected, so as to prevent the fall or collapse thereof during the construction and thereby render such employment, and construction, and place of employment safe for the work.

(c) To adopt and use those practices, means, methods, and operations, in securing, bracing and guying the prefabricated parts of a building then being erected, so as to prevent the fall or collapse during the construction thereof and thereby render such employment, and construction, and place of employment safe for the work.

(d) To do those things which a prudent employer would have done, had it turned its mind to the fact, and which were required to secure, brace, and guy the prefabricated parts of a building, to protect the life, limb and safety of the employees.

(e) To use and to exercise that degree of prudence, foresight and caution which, under the circumstances, a prudent employer would then and there have used and exercised, had it turned its mind to the fact, in requiring, permitting and directing its employees to go, work, and be, in employment, and construction, and place of employment, that was then and there unsafe.

(f) To use and to exercise that degree of prudence and caution which, under the circumstances, a prudent employer would then and there have used and exercised, had it turned its mind to the fact, in requiring and directing its employees, to work upon, or in connection with, the erection of prefabricated parts of a building, without first insuring and securing proper, adequate, and necessary bracing and guying so as to prevent the collapse of said structure during, and in the course of, said erection and construction.

(g) To comply with the requirements of Labor Code, sections 6400, 6401, 6402, and 6403, and each of them, neglecting, and omitting, to provide, secure, furnish and maintain, in place, and at the place of employment, necessary and adequate bracing and guying of the prefabricated parts of a building then being erected so as to prevent its fall or collapse during, and in the course of, said construction.

The majority assumes that the evidence is sufficient to support such findings, but nevertheless annuls the award because it interprets these findings as supporting a conclusion

that petitioner was guilty of negligence only. By what legerdemain may it be said that an employer who is found guilty of serious and wilful misconduct because he knowingly and wilfully failed to provide a safe place for his employees to work, is guilty of negligence only? The answer to this question contained in the majority opinion is based upon a process of reasoning out of harmony with the social philosophy which postulated the statutory provisions here involved and renders them ineffective. This philosophy stems from the basic concept that industry should bear the burden of injuries suffered by working men and women in the course of their employment, and since the employer could insure against injuries resulting from negligence it was necessary, in order to force employers to comply with safety regulations and provide safe places of employment, that they be subjected to increased awards to those injured as the result of their wilful failure to so comply. This philosophy is embodied in our statutes, and cases arising thereunder which have come to this court for review indicate judicious consideration by the Industrial Accident Commission. The case at bar is no exception.

Brushing aside the sophistry with which the majority opinion is replete, what are the realities of the situation here presented? They clearly show the evidence was sufficient. A building collapsed in the course of construction and four men working thereon were seriously injured—two of them fatally. It is admitted that the cause of the collapse was insufficient bracing—that this condition was called to the attention of the employer's superintendent and he did nothing to correct it although he had ample time and the means to do so. In other words the building was unsafe because it was not sufficiently braced and the employer *knew* that it was therefore highly dangerous—a danger that would inevitably result in serious injuries and death. Yet with that knowledge he put the workmen on the job. Certainly if an employer knows a place of work is fraught with grave danger but still compels his employees to face that danger, he evinces a reckless disregard of the safety of his employees. Whatever may have been the motives for his conduct, to save money, or time or to satisfy a sadistic impulse is not important. The weak excuse of the superintendent that he thought the building had enough bracing cannot change the result. The commission could disbelieve his testimony as to what he thought and conclude that he had full knowledge that the building was in an unsafe condition. On this evidence, the commis-

sion found that the employer knowingly and wilfully failed to provide a safe place of employment for the men who were injured and that such failure constituted serious and wilful misconduct. I do not see how the commission could have found otherwise. But the majority of the court seems to be more concerned with technical terms and phraseology than the liberal application of the law enacted for the protection of working men and women who have suffered loss of life and serious injuries as the result of its violation. In fact, the whole tenor of the majority opinion is to emphasize the burden placed on the employer by this legislation and minimize its salutary objective. It is the age-old reactionary concept of property rights above human welfare: What does it matter that working men and women are killed and injured because industrial enterprises are unsafe so long as employers can escape liability? To guard against injury to employees may cost the employer money, so why should he do so without compulsion? The answer is that experience has shown that some employers will not provide safety devices unless forced to do so, hence the remedial legislation here involved—that life and limb of employees be protected against unnecessary risks even if it costs the employer money to do so. Not only has the Legislature spoken by creating the liability of increased awards where serious and wilful misconduct is involved, but it has declared it to be the duty of the courts to liberally construe the provisions of the act ''with the purpose of extending their benefits *for the protection of persons injured* in the course of their employment.'' (Emphasis added.) (Lab. Code, § 3202.) This legislation has been generally accepted as extending to working men and women a measure of the economic and social justice to which people in industrial employment are entitled. Thinking people agree that social progress means, generally speaking, the gradual advancement of human welfare toward greater physical, moral and cultural enjoyment of life. The legislation here involved tends toward this objective and should be liberally construed to achieve it. The present decision finds no parallel in the annals of the judicial history of this state in its antithesis of liberal construction with respect to both the act here involved and the proceedings before the Industrial Accident Commission and this court.

The majority opinion assumes that there was sufficient evidence to support a finding of serious and wilful misconduct on the part of the employer and therefore increased benefits

could be properly awarded against it under section 4553 of the Labor Code, but it annuls the award on the grounds that the findings are not sufficient to support the award; that they are based upon the theory that negligence constitutes wilful misconduct and that all that was found was negligence.

The *main* contention made by the petitioner here is that the evidence is insufficient to support a finding of serious and wilful misconduct, yet the majority refuses to pass upon that question. (It is a matter I will discuss later herein.) That refusal violates the policy expressed by statutes dealing with decisions on appeal that where a new trial is granted the court shall "pass upon and determine *all* questions of law involved in the case, presented upon such appeal, and necessary to the final determination of the case." (Code Civ. Proc., § 53.) It is especially pertinent here for when the case goes back to the commission all it needs to do is to amend its findings. Petitioner will again seek a review of the case urging its main point that the evidence is insufficient. If the court decides it is insufficient then the case can be retried with additional evidence and another review sought. Such delays are inexcusable and should not be countenanced.

The findings are clearly sufficient. They read that the employee was injured by reason of the *"serious and wilful misconduct"* of the employer "in the manner and more particularly as follows." Then follow various particular findings. We need go no further under the law than the findings of serious and wilful misconduct; the particular findings may be ignored. A finding of serious and wilful misconduct in those words—the words of the statute (Lab. Code, § 4553)—is sufficient. (*California Shipbuilding Corp.* v. *Industrial Acc. Com.*, 31 Cal.2d 270 [188 P.2d 27]; *Kaiser Co.* v. *Industrial Acc. Com.*, 81 Cal.App.2d 818 [185 P.2d 353]; *General Petroleum Corp.* v. *Industrial Acc. Com.*, 90 Cal.App. 101 [265 P. 508]; *Clarke* v. *Industrial Acc. Com.*, 87 Cal.App. 766 [262 P. 471]; *Dawson* v. *Industrial Acc. Com.*, 54 Cal.App.2d 594 [129 P.2d 479]; *Vega Aircraft* v. *Industrial Acc. Com.*, 27 Cal.2d 529 [165 P.2d 665]; *Lumbermen's Mut. Cas. Co.* v. *Industrial Acc. Com.*, 29 Cal. 2d 492 [175 P.2d 823]; *Ethel D. Co.* v. *Industrial Acc. Com.*, 219 Cal. 699 [28 P.2d 919].) It is equally clear that a court will not annul an award if the findings are inconsistent. If there are findings which will sustain the award other findings which would annul it are not available for that purpose. (*George L. Eastman Co.* v. *Industrial Acc. Com.*, 186

Cal. 587 [200 P. 17]; *Southern Pac. Co.* v. *Industrial Acc. Com.*, 177 Cal. 378 [170 P. 822]; *Coombs* v. *Industrial Acc. Com.*, 76 Cal.App. 565 [245 P. 445]; *Hines* v. *Industrial Acc. Com.*, 215 Cal. 177 [8 P.2d 1021].) It necessarily follows that the majority holding which annuls the award by relying upon findings other than the ultimate one of serious and wilful misconduct is squarely contrary to the foregoing authorities. Yet none of them is even discussed. If it is the intention of the majority to overrule those cases it should be done openly and frankly. Moreover the statutory required liberal construction of the workmen's compensation laws (Lab. Code, § 3202) demands that the findings be liberally construed to support the award.

In addition to the findings of the ultimate fact of wilful misconduct, the commission *expressly* found the existence of wilful misconduct in detail. After making the ultimate finding, it is said that the misconduct occurred particularly as follows: That at and prior to the time of the collapse the employer *"did knowingly and wilfully fail"*; then follow seven separate paragraphs (a to g) specifying what the employer *wilfully and knowingly* failed to do or did, such as to furnish a safe place for the employee to work, to furnish and use proper safety devices, namely, bracing and guying for the structure so as to prevent its collapse. That such findings are adequate is beyond doubt. If an employer *knowingly and wilfully* fails to furnish a safe place for the employee to work (a safe place of employment is required by the safety laws of this state*) or to furnish supports to prevent a certain building from collapsing and injuring and killing workmen, we have the clearest case of serious and wilful misconduct that could be imagined.

The majority opinion cannot be reconciled with numerous cases. In *Parkhurst* v. *Industrial Acc. Com.*, 20 Cal.2d 826 [129 P.2d 113], this court annulled a commission finding of no wilful misconduct stating: "It has been held repeatedly

---

*"'Every employer shall furnish employment and a place of employment which are safe for the employees therein." (Lab. Code, § 6400.) "Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes, which are reasonably adequate to render such employment and place of employment safe. Every employer shall do every other thing reasonably necessary to protect the life and safety of employees." (Lab. Code, § 6401.) "'Safe' and 'safety' as applied to an employment or a place of employment mean such freedom from danger to the life or safety of employees as the nature of the employment reasonably permits." (Lab. Code, § 6310.)

that the employment of workmen under *dangerous conditions that can be guarded against constitutes a reckless disregard for their safety.* (Emphasis added.) (*Hatheway* v. *Industrial Acc. Com., supra,* [13 Cal.2d 377 (90 P.2d 68)]; *Hoffman* v. *Department of Indus. Relations, supra,* [209 Cal. 383 (287 P. 974, 68 A.L.R. 294)]; *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com., supra,* [209 Cal. 412 (288 P. 66)]; *Gordon* v. *Industrial Acc. Com., supra; Blue Diamond Plaster Co.* v. *Industrial Acc. Com., supra,* [188 Cal. 403 (205 P. 678)]; *Johannsen* v. *Industrial Acc. Com.,* 113 Cal.App. 162 [298 P. 99].)'' In *Hatheway* v. *Industrial Acc. Com.,* 13 Cal.2d 377, 380 [90 P.2d 68], the principles are stated and cases discussed: ''It has frequently been said that wilful misconduct involves the *knowledge* of the person that the thing which he is doing is wrong. . . . Conceding that knowledge is required, it seems to us that in order to prove the requisite knowledge, it is not necessary for the evidence to show positively that the person was notified of the unsafe condition of his premises, but that it is sufficient if it appears that the circumstances surrounding the act of commission or omission are such as 'evince a reckless disregard for the safety of others and a willingness to inflict the injury complained of.' ''

''The cases are quite uniform to the effect that permitting employees to work under dangerous conditions which are capable of being guarded against, constitutes such a reckless disregard for the safety of the employees that the Commission's finding that such conduct is serious and wilful will not be disturbed. The mere fact the employer did not believe the condition was dangerous does not relieve him from liability. Thus in *Blue Diamond Plaster Co.* v. *Industrial Acc. Com.,* 188 Cal. 403, 409 [205 P. 678], the employee was killed as a result of the failure of the employer to place guards on machinery. The managing agents of the employer testified that they knew of the condition, but stated that they did not consider the condition unsafe. 'Their mistake in judgment upon that subject cannot be held to relieve their employer from liability.' An award based on serious and wilful misconduct was affirmed. In *Hoffman* v. *Department of Industrial Relations,* 209 Cal. 383 [287 P. 974, 68 A.L.R. 294], it was held that where the employer violated the terms of a statute providing for a specified type of temporary flooring and its method of construction to be used when erecting a building, he was guilty of serious

and wilful misconduct, even though the employer was ignorant of the provisions of the statute. In *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.*, 209 Cal. 412 [288 P. 66], the employee was injured by an unguarded saw. The employer was held guilty of serious and wilful misconduct although the saw had been in operation but a week, and the employer testified that he intended to place a guard thereon. In *Gordon* v. *Industrial Acc. Com.*, 199 Cal. 420 [249 P. 849, 58 A.L.R. 1374], the employee was killed in a cave-in of a gravel pit. It was held that compelling an employee to work in a dangerous spot, without taking protective measures, where the employer knows or should have known of the danger is serious and wilful misconduct. In holding an employer guilty of serious and wilful misconduct under somewhat similar circumstances the appellate court in *Johannsen* v. *Industrial Acc. Com.*, 113 Cal.App. 162, 166 [298 P. 99], stated: 'Had he (the employer) turned his mind to a consideration of the subject he must have known that a person working in the trench was in jeopardy, which danger could readily have been obviated by the necessary bracing.' "

While the above cited cases differ factually from the case at bar the philosophy and legal concept of those cases is equally applicable here. The dangerous character of the place where the employees were required to work was obvious. If it was not known it was of such a character that it should have been known. Steps could easily have been taken to alleviate the danger but the employer did nothing whatsoever and sent the employees on that dangerous mission with reckless disregard of their safety.

To evade the specific provisions of the findings that the acts causing the collapse of the building were wilfully and knowingly done and hence wilful misconduct, the majority uses various devices. It ignores the express findings that the various things done or omitted and listed in paragraphs a to g are all qualified by the phrase preceding those paragraphs that the failure was wilful and knowing.

It discusses those paragraphs which appear to speak of negligence, failing, however, to stress the ones which do not point to negligence such as that the employer wilfully and knowingly failed to supply guy wires and braces for the structure. The findings pointing toward negligence should be disregarded under the authorities heretofore cited holding that such is the rule with regard to commission findings

and the rule which demands liberal construction of the findings. Even on appeal where findings of a court are reviewed, the rule is: "An appellate court will construe findings liberally in support of the judgment. Any uncertainties will be construed so as to uphold rather than defeat the judgment, that is, to give it effect rather than destroy it. All the findings are to be read together, and must be reconciled to prevent any conflict on material points, if possible. *Even if there is only one clear, sustained, and sufficient finding upon which a judgment may rest, it will be presumed that the court did rest the judgment on that finding.*

"In reviewing the sufficiency of findings to support a judgment, the appellate court will regard the ultimate facts found and not mere probative facts, unless the trial court's findings show that the probative facts are the only facts proved and that they alone are the basis for its finding of the ultimate facts. In the absence of such a showing, the mere circumstance that some of the probative facts are inconsistent with the ultimate facts will not prevent the ultimate facts from controlling. And whenever the facts found are such as might authorize different inferences, it will be presumed that the inference made by the trial court was one that will uphold rather than defeat the judgment. In such a case the appellate court will not draw any inference contrary to that which might have been drawn by the trial court for the purpose of rendering its judgment." (4 Cal. Jur.2d Appeal and Error, § 571.) (Emphasis added.)

The majority states that the theory of law adopted by the commission in its findings and award was erroneous. That, however, ignores the rule that: "It is, of course, immaterial that the theory upon which the judgment may be affirmed is not identical with that relied upon by plaintiffs or by the trial court, since plaintiffs are required only to plead and prove facts sufficient to justify relief, and the trial court's judgment must be affirmed if the findings, supported by the evidence, are sufficient to warrant the relief granted on any legal theory." (*Sears* v. *Rule,* 27 Cal.2d 131, 140 [163 P.2d 443]; 4 Cal.Jur.2d, Appeal and Error, § 536.) There is ample here in the evidence and findings to support the theory that wilful misconduct is more than negligence and is what the majority opinion describes it to be.

Other things stated in the majority opinion, although dictum, require comment. It is said that the increased award for wilful misconduct is a penalty and hence such an award

can be sustained only if the commission finds every fact essential to its imposition. In the first place the additional compensation is *not* a penalty. That was held in *E. Clemens Horst Co.* v. *Industrial Acc. Com.*, 184 Cal. 180 [193 P. 105, 16 A.L.R. 611], where the court held the provision for increased compensation was not even exemplary damages and hence was constitutional. That holding is based upon the obvious truth that ordinary compensation does not fully cover the loss suffered by the employee. (*E. Clemens Horst Co.* v. *Industrial Acc. Com.*, *supra*, 184 Cal. 180; *Western Indemnity Co.* v. *Pillsbury*, 170 Cal. 686 [151 P. 398]; *West* v. *Industrial Acc. Com.*, 79 Cal.App.2d 711 [180 P.2d 972].) Secondly, that statement is contrary to the above discussed rules that only ultimate facts need be found and findings must be liberally construed. In this same connection the statement that conduct any less culpable than wilful misconduct would be an "unlawful taking of the property of one person and unwarranted giving it to another" is also incorrect for the same reasons.

The majority opinion brushes aside such cases as *Bethlehem Steel Co.* v. *Industrial Acc. Com.*, 23 Cal.2d 659 [145 P.2d 583] and *Parkhurst* v. *Industrial Acc. Com.*, 20 Cal.2d 826 [129 P.2d 113], holding wilful misconduct was present where a safety order was violated with the comment that in the case at bar expert judgment was involved in guying the structure and no safety order was involved. Just as much expert judgment was involved and the safety order was substantially the same in those cases. Here we have the safety statutes and in the Bethlehem case the safety requirement was that loads transported by trucks be secured against displacement. The safety statute here requires that the structure be safe, that is, secured against collapsing by sufficient guy wires or bracing. This the employer knew but wilfully disregarded. Such disregard constituted serious and wilful misconduct.

I would therefore affirm the awards here made.

Respondents' petition for a rehearing was denied February 2, 1953. Carter, J., was of the opinion that the petition should be granted. Shenk, J., did not participate therein.